Samuel A. Spiegel, J.
This proceeding was initiated by the City of New York and the New York City Health and Hospitals Corporation, 14 groups or organizations who appear amici curiae, and two individuals who have been permitted to join a,s petitioners-intervenors because they are indigent pregnant women directly affected by this case. The relief sought is judgment annulling the determination of the respondent Commissioner dated April 8, 1971 which limits reimbursable abortions to those “ medically indicatedand further judgment directing the respondent Commissioner to continue to provide reimbursement for abortions authorized pursuant to section 125.05 of the Penal Law and to declare subdivision 2 of section 365-a of the Social Services Law unconstitutional.
*403 This court’s decision must interpret and reflect the law as it stands. This court does not pass on the highly emotional and controversial views of abortion per se. Since the Legislature enacted, the law which authorizes an abortion within 24 weeks from the commencement of pregnancy, abortion then becomes a matter of choice, resting with the individual. The question presented is what is the effect of the order of the Social Services Department of April 8,1971 which in effect said that there would be no reimbursement by way of medicaid for an abortion unless it was “medically indicated”. In other words, not everyone entitled to medicaid for physicians’ services, wanting an abortion, would be able, as of right, to have medicaid pay for it. Those who want an abortion unless it is “ medically indicated ”, would be obligated to pay for it themselves. The problem arises as to those who want an “ elective induced abortion ” and are deprived of medicaid because it is not “medically indicated” and yet cannot otherwise afford to pay for it.
In other words, are the indigent, eligible for medicaid for medical attention, who do not want a child because of handicaps, such as too large a family, inadequate housing, insufficient income, or other personal reasons, unfairly and unconstitutionally being deprived of their right to an abortion by this directive! Are they unlawfully and improperly denied their right to medicaid reimbursement for an abortion though eligible for all medicaid-approved medical treatment!
Abortions are now freely authorized upon request of the woman and the consent of the doctor within 24 weeks of pregnancy, by the enactment of the 1970 State Legislature of section 125.05 of the Penal Law which became effective on July 1, 1970. Since then, and up to April 8,1971 medicaid was available to all those seeking an “elective induced abortion” without any question, restriction or limitation.
“ Medically indicated ”, says the State, is when a doctor certifies that there is some existing medical reason necessitating an abortion. This directive, it is argued, circumscribes, restricts, limits and narrows the right bestowed upon all citizens by the Penal Law. Consequently, it is invalid, since only those who can afford an abortion can freely have it, while those who are indigent and cannot afford it must show it is “ medically indicated ” before they are privileged to obtain this right.
The State cannot discriminate, or terminate medicaid reimbursement for nonmedieally indicated abortions, thereby excluding some from this medical procedure, without a reasonable basis and without due process of law.
*404 After eight months of furnishing such medical aid, the new State policy denies poor persons due process and equal protection of the law in violation of the constitutional guarantee of the Fourteenth Amendment, in that the freedom of choice due to no funds, is taken from them since they cannot freely exercise the right to choose an abortion without the aid of medicaid.
No restrictions for the first eight months of the law were made by the State on the free right to choose an abortion. This was a private matter between the woman and her doctor. All medicaid abortions were reimbursable until April 8, 1971 without any limitation or conditions.
Pursuant to subchapter XIX of chapter 7 of title 42 of the United States Code (§ 1396 et seq.) Federal appropriations are available to the States, for the purpose of funding State programs for medical assistance to certain groups of needy individuals. Section 1396 states that appropriations under sub-chapter XIX shall be used to furnish (1) medical assistance for families with dependent children and families of aged, blind or disabled individuals, which are financially incapable of providing themselves with necessary medical services and (2) rehabilitation to help such families and individuals reach a ‘ ‘ capability for independence or self-care ’ ’.
For a State to be eligible to receive such Federal appropriations it must conform to the statutory requirements of sub-chapter XIX. One such requirement is that the State must submit its plan of medical assistance to the needy to the Secretary of Health, Education and Welfare (hereinafter referred to as HEW) for approval. (§ 1396.) Another Federal statutory requirement is that the content of the State plan, submitted to the Secretary of HEW for his approval, must comply with the provisions found in section 1396a.
Section 1396d (subd. [a], par. [vi], subpars. [1] through [5]) of title 42 of the United States Code provides the basic types of medical assistance which must be furnished under a State plan for needy individuals within the groups specified in section 1396a (subd. [a], par. [13], subpars. [B] and [C]). These'clauses provide for: (1) inpatient hospital services (other than services in an institution for mental diseases or tuberculosis); (2) outpatient hospital services; (3) laboratory and X-ray services; (4) skilled nursing home services for individuals 21 years or older, and diagnosis of individuals under the 21 years to ascertain their physical or mental defects and treatments for conditions discovered thereby; and (5) physicians’ services. The Code of Federal Regulations (tit. 45, ch. 2, § 249.10, subd. fb]. *405 par. [5]) defines “physicians services” as “those services provided, within the scope of practice of his profession as defined by State law ”.
Another significant requirement of the Federal act is found in subdivision (d) of section 1396a of title 42 of the United States Code. This section precludes a State from modifying its medical assistance plan unless the State applies to the Secretary of HEW for such an approval. This approval can be obtained only if the Governor of the State has certified certain facts relating to the expenditure of future funds and adherence of the State to its own plan. In addition, pursuant to subdivision (d) of section 1396a a State is precluded from reducing the scope of coverage that is required for those classes set forth in section 1396a (subd. [a], par. [13], subpars. [B] and [C]) by section 1396d (subd. [a], par. [vi], subpars. [l]-[5]).
In order to participate in subchapter XIX appropriations section 363 et seq. of the Social Services Law were enacted.
Pursuant to section 363 of the Social Services Law the State of New York has declared its policy to be that a program of medical assistance be made available to the needy regardless of their race, age, national origin or economic standing. In addition, section 363 provides that the program is ‘ ‘ established to operate in a manner which will assure a uniform high standard of medical assistance throughout the state.”
Section 363-a of the Social Services Law mandates that the Department of Social Services submit a plan for medical assistance to the Secretary of HEW for his approval “ as required by title XIX of the federal social security act ”,
Section 365-a of the Social Services Law establishes the coverage and adequacy of medical assistance under the New York plan. Pursuant to subdivision 2 of section 365-a thereof ‘ ‘ medical assistance ” is defined as: “ payment of part or all of the cost of care, services and supplies which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap ’ ’.
In the first cause of action it is alleged that public policy has been expressed pursuant to the Penal Law and Social Services Law in support of abortions upon the request of the woman and with the consent of a doctor within 24 weeks of pregnancy, as within the realm of legally acceptable medical practice, and such abortions constitute medical treatment practiced generally throughout the State. Thus, it is argued, refusal to provide reimbursement is violative of section 365-a of the Social Services *406 Law in that the section does not limit reimbursable abortions to those “ medically indicated ”. Further, petitioner states such abortions are necessary to prevent “acute suffering” and to provide ‘ ‘ capacity for normal activity ’ ’ and that as the result of the respondent’s threatened refusal of reimbursement the city and its agency are injured since they must then bear the full cost of such services bars indigent women.
In the second cause the petitioners allege that subdivision (d) of section 1396a of title 42 of the United States Code provides: ‘‘ Whenever any State desires a modification of the State plan for medical assistance so as to reduce the scope or extent of the care and services provided as medical assistance under such plan, or to terminate any of such care and services, the Secretary shall, upon application of the State, approve any such modification if the Governor of the State certifies to the Secretary that * * * ’ ’. The intent to withhold reimbursement as evidenced by the directive of April 8, 1971, petitioner contends, is a reduction and termination of medical services without prior approval of the Secretary of HEW.
In a third cause it is alleged under the pertinent statutes the following medical assistance must be afforded the individuals encompassed by section 1396a (subd.[a], par. [13], subpars. [B] and [0]) subchapter XIX of title 42: “ (1) inpatient hospital services (other than services in an institution for tuberculosis or mental diseases); * * *
“ (5) physicians’ services, whether furnished in the office, the patient’s home, a hospital, or a skilled nursing home, or elsewhere;”. Medical assistance is required for services which include all “ inpatient hospital services ” and “ physicians’ services ” and refusal to make reimbursement violates section 1396a (subd. [a], par. [13], subpars. [B] and [0]).
In a fourth cause it is alleged that the threatened refusal to reimburse violates the Fourteenth Amendment to the United States Constitution, and section 11 of article I of the New York State Constitution, in that it deprives indigent women of the equal protection of the law. No compelling State interest exists which justifies such refusal. The respondent’s directive creates two classifications, one of which deprives indigent women of the opportunity to freely decide whether to bear a child. In addition, there will result an increased likelihood that indigent women will resort to unsafe and illegal means to obtain abortions, segregating this class of women as based solely upon indigency without any compelling State interest to justify such classification. Further, it is alleged, in the alternative, that if reimbursement is not authorized by subdivision 2 of section *407 365-a of the Social Services Law, the section violates the Fourteenth Amendment to the United States Constitution and section 11 of article I of the New York State Constitution, depriving indigent women of medical assistance available to others with requisite means and does so without a compelling State interest to justify the difference in treatment.
Withholding reimbursement for expenses in connection with legal abortions constitutes an invidious discrimination against indigent women, denying them access to medical treatment which is available to those with sufficient funds, in violation of the equal protection clause of the Fourteenth Amendment.
A statute or regulation which made abortions legally justifiable and available only to the rich would clearly constitute an invidious discrimination against the poor in violation of the equal protection clause of the Fourteenth Amendment. Similarly, a provision by which abortions are made available under one set of circumstances for the wealthy, while a separate, more restrictive standard is established for the poor, would surely be discriminatory. The denial of medicaid for legal abortions has precisely this effect, since medical care for indigents is unavailable without State financial assistance.
In a fifth cause, it is alleged that refusal of reimbursement to indigent women denies them due process of law because such refusal bears no relation to the achievement of any legitimate State purpose. Needed financial economy cannot justify the refusal for medicaid to reimburse, since savings cannot be effectuated by permitting the birth of unwanted children among the indigent where there already is overwhelming likelihood that the public would be required to bear the ultimate burden of cost of parental care for the children, who would become public charges at birth. Further, the saving of the cost of the abortion would really be only an illusory financial gain for the public.
The stated purpose of the directive is to save State public assistance funds amounting to $3,000,000 annually. However, even a casual examination of the facts discloses that it is unlikely that any savings would result. Rather, the expense to the State would increase under the purported interpretation of the letter.
The average cost of an outpatient abortion in New York City is $64, and the average cost of an inpatient abortion is $177. This is to be contrasted with the medicaid cost expense of prenatal care and hospital and medical services involved in the delivery of a child, the average cost of which is $800. Also, $624 a year in additional welfare funds might well have to be provided for the maintenance of the child up to 18 years of age *408 under the Aid to Dependent Children Program (figures reported in New York Times editorial, April 3,1971).
If, on the other hand, an indigent woman who has been denied medicaid elects to perform the abortion on herself or to use an unqualified abortionist, serious complications are likely to ensue, the treatment of which would cost far more than an abortion and would be reimbursable under medicaid.
Thus, if the statute and the alleged letter of clarification limit the scope of reimbursable abortions, they are in no way reasonably related to the economizing of public funds.
Moreover, if indigent women are denied the opportunity to obtain safe medical abortions, experience has shown that many of them will seek the services of low-cost, ill-equipped, illegal back-room abortionists, or even attempt self-abortions, thus reviving one of the major health problems which the enactment of section 125.05 of the Penal Law sought to alleviate, to wit, the complications caused by nonmedical, illegal self-abortions and bungled abortions.
This new policy is in contradiction to the public policy as established by section 125.05 of the Penal Law. The directive would, in effect, serve to abridge or repeal said section in a highly unorthodox manner, by usurpation of the powers vested solely in the Legislature.
In the alternative, it is alleged that if refusal of reimbursement is based upon the ground that it is not authorized by the Social Services Law, then, it is urged, that the latter violates the Fourteenth Amendment of the United States Constitution, and article I of the New York State Constitution, depriving indigent women of medical assistance without a legitimate State purpose.
Petitioners contend that the refusal to provide reimbursement for all abortions authorized by section 125.05 of the Penal Law violates subdivision 2 of section 365-a of the Social Services Law. The petitioners are unable to determine the precise scope of what constitutes a ‘ ‘ necessary and medically indicated abortion ” pursuant to the respondent Wyman’s directive of April 8, 1971. However, if the directive is to have any meaning ascribed to it then its interpretation must be that it changes the prior policy of providing reimbursement for all abortions authorized by section 125.05 of the Penal Law.
Notwithstanding whether or not the directive changed prior policy, the petitioners submit that all abortions authorized by section 125.05 of the Penal Law constitute “ medical assistance * # * necessary to prevent * * * conditions in the person that cause acute suffering, endanger life * * * or * * * interfere with capacity for normal activity” within *409 the meaning of subdivision 2 of section 365-a of the Social •Services Law and as such are reimbursable.
In a sixth cause it is alleged that the respondent’s directive denies indigent women due process of law in that ‘ ‘ medically indicated ’ ’ is vague, undefined, and without standards and will discourage voluntary hospitals from performing any abortion in the belief that it may not be reimbursable as one that is “ medically indicated
The standard, that an abortion be ‘ ‘ necessary and medically indicated ” in order to be medicaid-reimbursable is unconstitutionally vague.
It is the contention of amici that the standard “necessary and medically indicated ” is so vague that those who provide abortion services have been, and presumably will continue to be, discouraged from performing abortions for medicaid eligibles because of an apprehension that the Department of Social Services may rule that some abortions are not ‘1 necessary and medically indicated”. Generally, the issue of vagueness has been resolved in cases involving criminal statutes. But the reasoning of those cases is nonetheless applicable in the instant case.
In Connally v. General Constr. Co. (269 U. S. 385 [1926]), the test of the specificity required was stated as follows: “ A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process ” (p. 391).
Challenges for vagueness which infringe upon fundamental human rights are to be closely scrutinized.
In the instant case, the effect of the respondent’s vague directive is to place indigent women in a position in which they would be denied abortions because hospitals would have no way of knowing which abortions will be reimbursable by medicaid.
So much for petitioners’ contentions.
For a first defense, respondents rely on subdivision 2 of section 365-a of the Social Services Law and section 90.1 of the Rules of the State Board of Social Welfare, which states: “ Medical care shall mean necessary preventive, diagnostic, corrective, and curative services, and supplies essential thereto, provided by qualified medical and related personnel for conditions in a person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activities, or threaten some significant handicap.” (18 NYCRR 90.1). Further, respondent says that the April 8, 1971 directive was *410 proper and in accordance with law, and the acts of the respondents are neither arbitrary nor unreasonable.
In a second defense it is alleged that the petitioners have no standing to bring the action and fail to show an injury to their personal rights. In a third defense it is alleged that the provisions of the statutes and regulations involved are a proper exercise of police power.
In a fourth defense it is alleged that the statutes, regulations and acts complained of do not conflict with and are not contrary to the provisions of section 1396 et seq. of title 42 of the United States Code, or any other Federal statute or regulation. Respondents state elective abortions are not 1 ‘ medically indicated ” and, therefore, are not reimbursable.
So much for respondents’ contentions.
The law is a distillation of social mores. Legislative enactments reflect the will of the people. The Penal Law, as amended by the Legislature, followed the report of the Temporary State Commission on Revision of the Penal Law designated by Governor Rockefeller, which reads in part: “ Until our law is reasonably liberalized, the so-called abortion racket will continue unrestrained; operated by doctors who have no regard whatsoever for law, and sometimes by what have been called untrained butchers using ‘ coat hangers ’, with inadequate equipment, in unsanitary surroundings, and without proper post-operative care. There is widespread and almost open defiance and disregard of our present law, with rarely a prosecution, not to speak of a conviction.”
The objectives to be attained were stated by the commission as follows: ‘c The deaths, sterility, and harm to physical and mental health resulting from the large number of illegal abortions each year could largely be prevented if such abortions were performed by competent physicians in proper hospitals ”.
Among the services performed by municipal hospitals are ‘ ‘ elective induced abortions ’ ’ not prohibited by section 125.05 of the Penal Law which provides:
“ 3. ‘ Justifiable abortional act ’. An abortional act is justifiable when committed upon a female with her consent by a duly licensed physician acting * ® * b. within twenty-four weeks from the commencement of her pregnancy.”
In his April 8, 1971 directive Commissioner Wyman stated: “ A number of people have indicated recently their belief that elective abortions not medically indicated are reimbursable under the Medicaid program. These members of the public may have been misled by the wording of the captions to the pertinent fee schedules, ‘ Elective Induced Abortions’ ”.
*411 He reiterated what he professed to be the pertinent controlling law as expressed in subdivision 2 of section 365a of the Social Services Law which defines medical assistance to mean payment of ‘ ‘ the cost of care, services and supplies which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap and Avhich are furnished an eligible person in accordance with the proAdsions of this title, the rales of the board and the regulations of the department.” He referred also to section 90.1 of the State Board of Social Welfare Buies which reads: “ Medical care shall mean necessary preventive, diagnostic, corrective, and curative services, and supplies essential thereto, provided by qualified medical and related personnel for conditions in a person that cause acute suffering, endanger life, result in illness or infirmity, interfere loith his capacity for normal activities, or threaten some significant handicap.”
The original State plan was enacted and approved by the Secretary of HEW in pursuance of the authority to do so as granted to the States pursuant to section 1396 of title 42 of the United States Code. Thereupon, voluntary hospitals performed abortions authorized by the Penal Law and were reimbursed for such services as ‘1 elective induced abortions ’ ’ pursuant to section 533.6 of chapter 2 of the Regulations of the respondent Department. (18 NYCRR 533.6.)
Basically, it is petitioners’ position that respondent’s letter of April 8, 1971 titled “ Clarification of Policies Relating to Reimbursement for Abortions ’ ’ is a change and not merely a clarification, and violates Federal and State legislation and regulations and the constitutional rights of the individual. Whether designated by any nomenclature, the petitioners state that this is, in effect, a definite change Avhich restricts, circumscribes and prohibits the free right to an abortion.
In Griffin v. Illinois (351 U. S. 12 [1956]), and its progeny, the Supreme Court has made clear that it will look to the effect of State action for purposes of judging its constitutionality where the effect was to discriminate against the poor in respect of their basic equal right to effective criminal appellate revieAV. The court invoked a rigorous equal protection test to invalidate an Hlinois provision which charged a single scale of fees to all persons who ordered criminal trial transcripts.
The Hlinois requirement, neither by its terms nor its purposes, discriminated against the poor. However, the court looked to the effect of the requirement and concluded that the practical *412 unavailability of transcripts to the poor denied them equal protection of the law and an equal right to an effective criminal appeal.
Accordingly, the Illinois court was directed to provide full and effective appellate review to indigents, either by providing free transcripts or otherwise. The court held that the refusal to pay for the transcript of an indigent denied equal protection of the laws because even though the State was not constitutionally compelled to provide an appeal it could not do so in a way that discriminated against a person and denied him the benefit of that policy because of his poverty.
The court said on page 18: “ It is true a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all. * * * But that is not to say that a State that does grant appellate review can do so in a way that discriminates against some convicted defendants on account of their poverty. ’ ’
In Douglas v. California (372 U. S. 353, 355 [1963]) the Supreme Court applied this rigorous equal protection test to a California provision which, in the case of indigents appealing a criminal conviction, provided that the appellate court would search the record to see whether it would be “ of advantage to the defendant or helpful to the appellate court ” to have counsel appointed for the appeal. The Supreme Court held that procedure unconstitutional, even though it uniformly gave to each individual the right to counsel on appeal if he could afford it and though the procedure served the otherwise legitimate State purpose of providing counsel only for nonfrivolous appeals. Once again, the court looked to the impact of the procedure and held that once the right to appeal was granted, the poor must have the same right to an appeal as the well-to-do.
The principle that even though a State is not constitutionally compelled to pursue a policy but once it does then it must do so without discriminating against any party because of his indigency was followed in Douglas v. California (supra). There it was held that a State violated the equal protection of the laws when it refused to provide counsel to an indigent on an initial appeal (ibid., pp. 355, 356). Thus, once having chosen to extend the benefit, thereafter, the State must provide it to all persons in a manner that does not violate the equal protection clause. (See, also, Rinaldi v. Yaeger, 384 U. S. 305, 310-311 [1966] ; McMillan v. Board of Educ. of State of N. Y., 430 F. 2d 1145, 1149 [2d Cir., 1970].)
In each of the cases, the State action under attack did not on its face or in its purpose discriminate against the poor. In each *413 of these cases, the basic “ right ” which was effectively impaired was one of State creation, which nonetheless had to be extended equally to all. And in each of the above cases, the Supreme Court looked beyond the superficial uniformity and nondiscriminatory intent of State action to find a denial of equal protection where there was a discriminatory result, and effective deprivation of a basic personal interest. Like the above line of Supreme Court cases, the instant case involves State action which in its result bears particularly harshly upon the poor with respect to their vital personal interests.
In the instant case, the effect of the directive is clearly to discriminate against the poor in their effort to obtain legal abortions. If the directive correctly construes the statute to mean that no medicaid reimbursement will be allowed for elective legal abortions, the statute is unconstitutional in that it deprives indigent women of their constitutionally protected right of privacy which includes the right to decide whether or not to bear a child.
A series of United States Supreme Court decisions have declared a constitutionally protected ‘ ‘ right of privacy ’ ’ in matters of marriage, the family, sex and procreation. (See e.g., Griswold v. Connecticut, 381 U. S. 479 [1965] [right of married women to use contraceptives] ; Loving v. Virginia, 388 U. S. 1 [1967] [right to marry] ; and Pierce v. Society of Sisters, 268 U. S. 510 [1925] and Meyer v. Nebraska, 262 U. S. 390 [1923] [right to direct upbringing and education of children].)
Several courts have recently held that this constitutional right of privacy includes the right to choose whether to terminate a pregnancy by means of an abortion. In People v. Belous (71 Cal. 2d 954), the Supreme Court of California explicitly recognized this right and characterized it as “ fundamental. ’ ’
In Babbits v. McCann (310 F. Supp. 293 [E. D. Wis., 1970] [Per Curiam], app. dsmd. 400 U. S. 1 [1970]) and Roe v. Wade (314 F. Supp. 1217 [N. D. Tex., 1970] [Per Curiam], app. docketed 39 U. S. L. W. 3151) three-judge Federal courts held State abortion statutes unconstitutional on the ground that they interfered with a woman’s right to choose whether or not to bear a child, a right secured by the Ninth Amendment, and that the States involved had failed to show a compelling interest for their violation of this right.
In Babbits, court said (p. 302) that: “ The police power of the state does not * * * entitle it to deny a woman the basic right reserved to her under the ninth amendment to decide whether she could carry or reject an embryo which has not yet quickened. ’ ’
*414 In Roe v. Wade (supra, p. 1221) the court agreed with plaintiffs’ principal contention “ that the Texas Abortion Laws must be declared unconstitutional because they deprive single women and married couples of their right, secured by the Ninth Amendment, to choose whether to have children ”, saying:i£ The essence of the interest sought to be protected here is the right of choice over events which, by their character and consequences, bear in a fundamental manner on the privacy of individuals.”
Medicaid recipients are by definition unable to obtain medical services without public assistance. Since it is both unsafe, and in New York also illegal, to obtain an abortion without the services of a qualified physician, an indigent woman’s right to terminate a pregnancy is meaningless as a practical matter unless the necessary medical services are medicaid-reimbursable.
Since the right to decide not to have a child has been held to be a fundamental one protected under the Ninth Amendment, the State has an obligation to provide the indigent with adequate means to exercise that right. The situation is not unlike that presented in Gideon v. Wainwright (372 U. S. 335, 344 [1963]) where the Supreme Court held that the right to counsel in criminal cases, guaranteed in Federal courts under the Sixth Amendment, was so fundamental that ££ any person hailed into court, who was too poor to hire a lawyer, cannot be assured a fair trial unless counsel is provided for him.”
The Supreme Court has also recognized that where a State has a monopoly on the means by which a right may be exercised, the Constitution requires that indigents be afforded an opportunity to exercise that right without cost. Thus, in Boddie v. Connecticut (401 U. S. 371, 374), the court held that ££ given the basic position of the marriage relationship in this society’s hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship, due process does prohibit a State from denying, solely because of inability to pay [court fees and costs], access to its courts to individuals who seek judicial dissolution of their marriages.”
In view of the fundamental nature of the right to terminate a pregnancy, and the fact that the State has determined that an abortion may be performed only by a duly licensed physician (Penal Law, § 125.05), the Constitution similarly prohibits the State from denying to indigent women access to physicians in order to exercise this right.
Accordingly, if section 365-a of the Social Services Law does not permit medicaid-reimbursement for all lawful abortions, it denies indigent women the fundamental right to decide whether *415 to have a child, and violates the Ninth and Fourteenth Amendments to the United States Constitution.
The petitioners submit that the denial of reimbursement for all abortions authorized by section 125.05 of the Penal Law denies indigent women the equal protection of the laws.
Petitioners5 challenge cannot be answered by the argument that the receipt of medicaid reimbursements for any form of medical care constitutes a “ privilige 55 and not a “ right The conclusion sought to be upheld from this dichotomy is that since it is a “ privilege " it can be conditioned in any manner by the State. The “ right/privilege '’characterization has been specifically rejected as being dispositive, by various decisions of the United States Supreme Court. (See Sherbert v. Verner, 374 U. S. 398, 404 [1963] [unemployment insurance] ; Shapiro v. Thompson, 394 U. S. 618, 627 [1969] [welfare] ; Flemming v. Nestor, 363 U. S. 603, 611 [1960] [disability insurance] ; Slochower v. Board of Educ., 350 U. S. 551, 555 [1956] [public employment] ; Bolling v. Sharpe, 347 U. S. 497 [1954] [public education].)
The law of equal protection has evolved that even if a State is pursuing a policy that it is not constitutionally obligated to follow it must nonetheless refrain from any discriminatory practices in executing that policy. (See, e.g., Griffin v. Illinois, 351 U. S. 12, supra ; Douglas v. California, 372 U. S. 353, supra ; Shapiro v. Thompson, supra.) Any classification drawn in executing such a policy must be based on a reasonable basis (Dandridge v. Williams, 397 U. S. 471 [1970]), or “ compelling governmental interests ” (Shapiro v. Thompson, supra, p. 627).
It is apparent that the only way that e discrimination against the poor ” can be eliminated is to provide the service at the public expense. All women of requisite means can still obtain an abortion under section 125.05 of the Penal Law while all indigents cannot. The Supreme Court has indicated in Griffin v. Illinois (supra), and its progeny, that it will look to the effect of State action for purposes of judging its constitutionality. (See, also, Harper v. Virginia Bd. of Elections, 383 U. S. 663 [1966] [Virginia poll tax applied to all .persons indiscriminately was struck down on equal protection grounds because the effect was to impair the right of the poor to vote].) In the present case, the effect of the State’s refusal to provide medicaid reimbursement is to deny the poor the benefits of section 125.05 of the Penal Law solely because of their indigency. This result bears with particular harshness upon the poor with respect to their vital personal interests. The court must look beyond the face and purported intent of the challenged State action and *416 evaluate the respondent’s action in light of its realistic effect. The effect of the directive is to repeal by administrative fiat the act of the Legislature in amending the Penal Law. Such a result cannot stand, whatever its motivation.
Since the refusal to provide reimbursement is in no way related to the purpose of saving public assistance funds and its obvious effect is to deny the very class that section 125.05 of the Penal Law intended to benefit, such refusal violates the rights of indigent women to the equal protection of the laws.
A woman has a constitutional right pursuant to the Ninth and Fourteenth Amendments to the United States Constitution to terminate an unwanted pregnancy. The refusal to provide medicaid reimbursement for .abortions. to indigents authorized by section 125.05 of the Penal Law abridges the exercise of that right without any compelling State interest.
In Pierce v. Society of Sisters (268 U. S. 510, 534-535, supra) an Oregon statute prohibiting parents from sending their children to private schools was struck down because it unreasonably interfered with the liberty of parents to direct the “ upbringing and education of children under their control ’ ’.
In Prince v. Massachusetts (321 U. S. 158, 166 [1944]), where a statute prohibited persons from encouraging minors to sell articles in public places, the Meyer and Pierce decisions were interpreted to ‘ ‘ have respected the private realm of family life which the state cannot enter ’ ’.
In Skinner v. Oklahoma (316 U. S. 535, 536 [1942]) the court invalidated a compulsory sterlization law, Mr. Justice Douglas noted in respect to the right to have offspring that it is “ a right which is basic to the perpetuation of a race ”.
Since it was clear that there was a constitutional right to have children, to control their upbringing and to govern their education the court then held in Griswold v. Connecticut (381 U. S. 479, supra) that a necessary corollary of these rights was a right of privacy which encompassed the right to determine when and whether to bear children. In Griswold, the right not to bear children by the use of contraceptives before conception occurred was upheld. The court struck down a statute prohibiting the use of contraceptives to prevent conception as an unwarranted infringement of the rights surrounding the marital relationship.
Since the right of privacy encompasses the right to prevent the birth of children by action prior to conception some courts have held that the right includes the power to prevent the birth of children after conception. The right to an abortion has been upheld in a series of recent cases. In People v. Belous (71 Cal. *417 2d 954, supra) the Supreme Court of California explicitly recognized the fight and characterized it as '“ fundamental ”. The court said (p. 963) “ The fundamental right of the woman to choose whether to bear children follows from the Supreme Court’s and this court’s repeated acknowledgement of a ‘ right of privacy ’ or ‘ liberty ’ in matters related to marriage, family, and sex.”
In Babbitz v. McCann (310 F. Supp. 293, app. dsmd. 400 U. S. 1, supra) and Roe v. Wade (314 F. Supp. 1217, supra, app. docketed 39 U. S. L. W. 3151) three-judge Federal court held State abortion statutes unconstitutional on the ground that they interfered with a woman’s right to choose whether or not to bear a child, a right secured by the Ninth Amendment, and that the States had failed to show a compelling interest for their interference with such right.
In Roe v. Wade (supra, p. 1221) when confronted with plain-" tiffs ’ principal contention ‘1 that the Texas Abortion Laws must be declared unconstitutional because they deprive single women and married couples of their right, secured by the Ninth Amendment, to choose whether to have children,” the three-Judge court succinctly held, “ We agree.” The court stated: “ The essence of the interest sought to be protected here is the right of choice over events which, by their character and consequences, bear in a fundamental manner on the privacy of individuals.”
The legislative history surrounding abortion reform in this State indicates that the Legislature intended for more than a mere removal of a penal sanction. When it enacted section 125.05 of the Penal Law in 1970 it intended to promote the health and general welfare of all women confronted by an unwanted pregnancy. But even more significant is the fact that the Legislature intended to promote the health and general welfare of indigent women. The message of the Hon. Nelson Rockefeller to the Legislature, recommending passage of a more liberal statute, specifically noted that such a change was needed in order to, inter alia, ‘ ‘ reduce discrimination against the poor, when those who can afford it may engage relatively safe, illegal, high-priced physician-abortionists or travel to other countries whereas the poor are limited to less skilled paramedical abortionist or worse, or to reliance on self induced abortions: ’ ’
Such a declared statutory objective makes it clear that the State was embarking on a policy it deemed beneficial to indigent women confronted by an unwanted pregnancy. The State was not constitutionally compelled to follow such a policy. But once it did so then it cannot discriminate thereafter against any included party by adding a restrictive and qualifying condition *418 for the indigent ones (Griffin v. Illinois, supra ; Douglas v. California, supra ; Rinaldi v. Yaeger, supra ; McMillan v. Board of Educ., supra).
Petitioners, City of New York and the Health and Hospital Corporation, have standing to assert the constitutional rights of indigent women to whom they have an obligation to provide comprehensive medical services. (Pierce v. Society of Sisters, 268 U. S. 510, supra ; Griswold v. Connecticut, 381 U. S. 479, supra ; Barrows v. Jackson, 346 U. S. 249 [1953].)
Respondent Wyman’s directive eliminates medicaid reimbursement for all abortions other than those “ medically indicated.” It is, in fact, the city’s hospitals which receive these reimbursements, not the medicaid eligibles themselves.
Petitioner has applied for reimbursement for all medicaid abortions already performed. Petitioner will suffer financial loss to the extent that it will not receive reimbursement for those abortions which are permitted under the Penal Law that may not have been “ medically indicated.”
Because of the respondent Wyman’s directive, the voluntary hospitals have already refused, and will continue to refuse to perform abortions on medicaid-eligibles which are not reimbursable. Such a curtailment of services by voluntary hospitals has resulted and will continue to result in an increased burden on municipal hospitals. Petitioner corporation will bear these additional costs, that is, the total cost of abortions performed on medicaid eligibles who have been refused treatment by the voluntary hospitals.
Since the city’s hospitals, administered by petitioner corporation, receive reimbursements, not the medicaid eligibles themselves, it is the petitioner corporation, not the medicaid eligibles, which suffers the financial losses.
Specific monetary damage is one of the requisite elements of standing in an article 78 proceeding. (Matter of Haber v. Board of Estimate of City of N. Y., 33 A D 2d 571, 572 [2d Dept., 1969] .)
Accordingly, petitioner corporation has standing to maintain this article 78 proceeding. (Matter of Mastrangelo v. State Council of Parks, 21 A D 2d 879 [2d Dept. 1964].)
Petitioner New York City is suing on behalf of all its needy women residents eligible for medicaid benefits. Its standing to sue is founded, first, on authority granted it under the New York City Charter.
Subdivision c of section 394 of the charter provides: “ c. Except as otherwise provided by law, the corporation counsel shall have the right to institute actions in laAV or equity and any proceedings provided by law in any court, local, state or national, to *419 maintain, defend and establish the rights, interests, revenues, property, privileges, franchises or demands of the city or of any part or portion thereof, or of the people thereof ’ ’.
The instant proceeding is one brought by the City of New York to establish the rights and interests of a part of its population, namely, needy women eligible for medicaid benefits. The New York City Charter explicitly affords this “ right ” to the City of New York. Accordingly, New York City has standing to maintain this proceeding. (See Matter of County of Nassau v. Metropolitan Transp. Auth., 57 Misc 2d 1025, 1027, affd. 32 A D 2d 647 [1969]) where the court held that by virtue of a provision in the Public Service Law (§ 109),1 ‘ a municipal corporation may appear before any court in an action or proceeding involving rates affecting the municipal corporation or any of its residents.”
Similar interests have supported a State’s right to sue in its capacity as parens patries on behalf of all its citizens. (Pennsylvania v. West Virginia, 262 U. S. 553 [1923] ; Georgia v. Pennsylvania R. R. Co., 324 U. S. 439 [1945].) Thus, in Pennsylvania v. West Virginia (supra) Pennsylvania and Ohio were allowed to maintain suits which sought to enjoin West Virginia from interfering with the flow of gas from West Virginia to the other States.
So, too, in the instant proceeding, New York City is suing to protect a twofold public interest.- The first is a financial interest. New York City bears the responsibility for operating all municipal hospitals. As set forth above, the directive of Commissioner Wyman has resulted and will result in greatly increased costs, because the municipal hospitals must now bear the total costs of abortions of all its residents, including all those turned away from the voluntary hospitals. Furthermore, if because of the enormously increased burden, municipal hospitals are unable to perform abortions on medicaid eligibles within the 24-week limit prescribed by section 125.05 of the Penal Law unwanted children will be born to indigent mothers and are likely to become public charges. The expense of supporting such children for approximately 18 years falls upon the city.
New York City’s second public interest relates to the health, welfare, and safety of her residents. The history surrounding the revision of section 125.05 of the Penal Law offers vivid examples of the death and disability attendant upon illegal abortions. If the municipal hospitals cannot, and the voluntary hospitals will not perform timely abortions, these needy women will again resort to those illegal procedures which have proved so calamitous in the past. To say that the health, welfare and safety of needy women is a concern of New York State is not to deny that *420 New York City shares this same interest. Bnt it is the State which is taking the action that threatens such interest. To deny the petitioners standing in this case under these circumstances would be highly illogical and a flagrant travesty of justice.
Clearly, modifications of the State plan require approval of the Secretary of HEW. The respondent Commissioner does not indicate any approval in his letter nor of the “ clarification ” contained in the letter of April 8, 1971. In addition, it may be noted that a considerable time had elapsed in which, to the Commissioner’s knowledge, authorized Penal Law abortions were reimbursable and the expense had been reimbursed, presumably pursuant to the practically accepted interpretation and evaluation of the existing laws. What occurred in the period July 1, 1970 to April 8, 1971, requiring “ clarification ” is somewhat mysterious and chargeable by a petitioner to political considerations.
Great weight should be given to the practice and interpretations of the official whose responsibility it is to interpret and implement the law. However, the April 8, 1971 directive is riot a clarification. Bather, it is an unapproved and unauthorized change or modification which, does violence to the intent of the Penal Law.
It is the opinion of the court that, when an interpretation or ‘ ‘ clarification ’ ’ of the law by an administrative body portends to affect all people equally but in effect results in denial of the benefits of said law to parts or segments of the citizenry, it represents denial of equal protection of the law without due process and cannot be tolerated.
Further, if the administrative ‘ ‘ clarification ’ ’ was not intended to change the intent of the law it has been amply demonstrated that realistically and practically the effect of the directive has resulted in a drastic change, since it has caused a denial of abortion services by hospitals to the indigent who would normally qualify for medicaid.
The directive is regressive and tends to defeat the objective of the Penal Law as amended which was to ameliorate the intolerable conditions prevailing prior to July 1, 1970', when abortion was permitted only when deemed necessary to save the life of the mother.
Obviously, the change did not eliminate the medical condition of pregnancy and, accordingly, petitioners contend they are unable to determine the precise scope of what constitutes ‘ ‘ necessary and medically indicated abortion ’ ’. In any event, the respondent’s directive changes the prior policy of providing reimbursement for all abortions authorized by the Penal Law *421 as amended. Such abortions, it is argued, constitute ‘ ‘ medical assistance * * * necessary to prevent * * * conditions in the person that cause acute suffering * * * or * * ® interfere with capacity of normal activity ’ ’, all as provided within the meaning of subdivision 2 of section 365-a of the Social Services Law. This is so, regardless of any person’s view of the matter. It is expressed public policy. Apart from the legal issues raised, it is obvious that respondent Commissioner’s directive will tend largely and grievously to restore the status quo ante, and back-alley abortions, and to negate the objectives that were recommended by the Governor’s commission.
The pregnant woman upon whom the permitted abortion is performed is in a condition that causes “ acute suffering ” which “ interferes with capacity for normal activity ”,
Nor can it be argued persuasively that “ acute suffering” within the meaning of subdivision 2 of section 365-a of the Social Services Law exists only if a physical disease is present and pregnancy, obviously, is not such a disease. An unwanted child to a woman at the subsistence level with no children or ten children presents a “ condition ’ ’ fraught with “ acute suffering ”. The retort that emotional or psychological suffering is not encompassed by subdivision 2 of section 365-a and therefore abortions are not reimbursable overlooks the reality that pregnancy is a physical condition with associated discomfort and, on occasion, severe complications.
Quite apart from the question as to whether there is a change or only a ‘ ‘ clarification ’ ’, the law mandates that an indigent is entitled to physician services for medical assistance (U. S. Code, tit. 42, § 1396). An abortion, it is advanced, comes within the purview of essential “ medical assistance ” (Social Services Law, § 365-a, subd. 2). Accordingly, there must be reimbursement for an indigent who avails himself under medicaid of the services of a duly licensed physician, for medical care and assistance including an abortion (U. S. Code, tit. 42, § 1396a). The State cannot, unilaterally, without the prior approval of HEW arbitrarily reduce the scope of this coverage (§ 1396a, subd. [d]).
The court will not be content to limit its construction of a statute or a directive merely to the printing on the face thereof. The court must carefully scrutinize and analyze the practical effect, impact and ramifications thereof upon the public. If, as in this case, it unreasonably deprives a group of the necessary wherewithal with which to obtain an abortion, then' the order serves to unfairly disenfranchise this group and to deny them due process and the equal protection of the law to which they are entitled.
*422 The directive must be condemned when it deprives some indigents of rights which all others enjoy. It is even less tolerable when it deprives some indigents of the rights which other indigents enjoy.
One of the intervenor-petitioners is a married woman whose husband’s income is low. They have three children and receive supplementary public assistance. She is presently approximately in her ninth week of pregnancy. The other intervenor petitioner is in a somewhat similar situation, and is presently approximately in her tenth week of pregnancy. These are but two instances of desperate families adversely affected by the directive. No doubt there are others similarly situated likewise denied the right to exercise their free choice.
The directive of Commissioner Wyman of April 8,1971, which limits abortions to those “medically indicated” is hereby annulled as unconstitutional and Commissioner Wyman is directed to continue to provide reimbursement for abortions authorized pursuant to section 125.05 of the Penal Law. Subdivision 2 of section 365-a of the Social Services Law is declared constitutional. It is not vague and indefinite. Petition is granted.