Gibson, J. (dissenting).
I dissent and vote to affirm the order of the Appellate Division holding the State Commissioner of Social Services without authority to direct that Medicaid reimbursement for abortions be limited to abortions ‘ ‘ medically indicated”, within the Commissioner’s restricted definition of that term. The directive is, in my view, not only in contravention of the statute (Social Services Law, § 365-a, subd. 2) specifying the character of medical assistance reimbursable under the Medicaid program, but it is repugnant, as well, to the legislative intent and the public policy of the State as expressed by the liberalized abortion law (Penal Law, ■§ 125.05, as amd. by L; 1970, ch. 127). Thus, by the denial to indigent women of reimbursement for abortions, the directive serves to revive the “ substantial evil” — as the Appellate Division termed it — which the 1970 amendment was designed to terminate. These are the central issues and it is not necessary, for the purposes of this dissent, to discuss the cognate questions and subsidiary problems which were also treated by the courts below.
Subchapter XIX of the Social Security Act (U. S. Code, tit. 42, § 1396 et seq.) provides for a Federally funded program of medical assistance to needy persons, under which the States may claim matching Federal funds for payments for medical care in appropriate cases. To accomplish New York’s participation in the program—known, of course, as Medicaid—the Legislature in 1966 enacted title 11 of article 5 of the Social Services Law (§ 363 et seq.). By section 365-a (subd. 2) of that act the term ‘ ‘ medical assistance ’ ’ is defined as the 1 ‘ payment of part or all of the cost of care, services and supplies which are necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with his capacity for normal activity, or threaten some significant handicap ”.
During the period between July 1, 1970 (the effective date of the amendment to section 125.05 of the Penal Law legalizing *539 abortion by consent within the first 24 weeks of pregnancy) and April 8, 1971 (the date of the Commissioner’s administrative directive), Medicaid payments were made as a matter of course on behalf of eligible women who obtained abortions lawful under the liberalized statute. The uncontroverted statistical proof supplied by respondents City of New York and the New York City Health and Hospitals Corporation demonstrates that some 16,168 Medicaid eligible abortions had been performed during this nine-month period in New York City alone.
The challenged directive is captioned “ Clarification of Policies Relating to Reimbursement for Abortions ” and, after noting that “ [a] number of people have indicated recently their belief that elective abortions not medically indicated are reimbursable under the Medicaid program ”, states: £< This impression is clearly contrary to well established policy, embodied in the Social Services Law, the rules of the Board of Social Welfare and the regulations of the Department of Social Services under which only necessary and medically indicated care is covered by Medicaid.”
At Special Term, the court applied the statutory definitions hereinbefore quoted, and concluded that a £ ‘ pregnant woman upon whom the permitted abortion is performed is in a condition that causes ‘ acute suffering ’ which ‘ interferes with capacity for normal activity ’ ”, and noted further that ££ [a]n unwanted child to a woman at the subsistence level with no children or ten children presents a 1 condition ’ fraught with ‘ acute suffering ’ ’’ (66 Misc 2d 402, 421); and respondents emphasize the conclusion that pregnancy interferes with the ‘ ‘ capacity for normal activity ’ ’, and cite, as examples, diminished general mobility and the not uncommon requirement of at least a mandatory leave of absence from employment.
Purely semantic inquiry, however, will not elicit meaningful answers without consideration of the legislative intent and the public policy of the State with regard to elective abortions. There is, of course, a great wealth of material bearing on the liberalized abortion law; but the report of the Governor’s Commission on New York State’s Abortion Law, under the chairmanship of Judge Froessel, is especially enlightening. As relevant to our inquiry, certain salient considerations underlying the reform bill may be noted. First, the commission’s *540 report reflected the preventive nature of the proposed legislation : ‘ ‘ The deaths, sterility and harm to physical and mental health resulting from the large number of illegal abortions each year could largely be prevented if such abortions were performed by competent physicians in proper hospital surroundings, within the framework of reasonable legislation.” (Report of Governor’s Commission on N. Y. State’s Abortion Law [March, 1968], p. 19.) This, of course, bears upon the provision in section 365-a (subd. 2) of the Social Services Law, which affords coverage for medical services “ necessary to prevent * * * conditions * * * that cause acute suffering * * * [or] result in illness or infirmity”.
Second, the proposed legislation was viewed as a means to afford indigents the opportunity to obtain abortions in situations where otherwise only the well-to-do would be able to obtain competent medical intervention, and reform would thus “ reduce discrimination against the poor, when those who can afford it may engage relatively safe, illegal, high-priced physician-abortionists or travel to other countries, whereas the poor are limited to less skilled paramedical abortionists or worse, or to reliance on self-induced abortion ”. (1968 Report, supra, p. 53.) Indeed, it seems clear that, under respondent Commissioner’s directive, those individuals without sufficient funds for adequate medical care (who, by definition, are those eligible for Medicaid) will once again bear the brunt of the unfortunate and often tragic consequences that, in the past, so often flowed from the restrictive statute (see Governor’s Messages to Legislature, N. Y. State’s Abortion Law [April 16, 1969], N. Y. Legis. Annual, 1969, pp. 524-525). These considerations distinguish the issue on appeal from the examples of cosmetic plastic surgery and voluntary sterilization cited by appellants as instances where Medicaid payments have been refused.
A closely related consideration is that the Commissioner’s directive has the effect of reviving the substantial evil which the amendment to the Penal Law was designed to eliminate. Prior to the liberalized abortion law, the large number of illegal abortions often resulted in “ deaths, sterility and harm to physical and mental health and the reform would, as the Governor’s commission observed, “ help alleviate a dangerous public menace”. (1968 Report, supra, p. 19.)' The commission also found *541 that as long as elective abortions remained inaccessible to those women who did not have the funds with which to procure relatively safe, illegal abortions, “ the so-called abortion racket will continue unrestrained, operated by doctors who have no regard whatsoever for law, and sometimes by what have been called untrained butchers using ‘ coat hangers ’, with inadequate equipment, in unsanitary surroundings, and without proper postoperative care.” (Id., p. 17.)
As also bearing on the construction properly to be given section 365-a of the Social Services Law, it must be noted that the Federal statute establishing the Medicaid program designates as one of its two objectives and purposes rehabilitation and other services to help families and individuals, whose income and resources are insufficient to meet the costs of necessary medical services, to attain or retain “ capability for independence or self-care ” (U. S. Code, tit. 42, § 1396). Whether an indigent woman denied reimbursement for a projected abortion as a result of the Commissioner’s directive turns to illegal methods to abort, or carries the unwanted child to full term, it is clear that in neither case will the attainment of independence or a greater capability for self-care be encouraged.
Thus, considering this State’s expressed policy and the legislative intent underlying the abortion reform, and addressed to the evils thereby sought to be eliminated, and giving weight, too, to the stated purposes of the Medicaid program and the minimal requirements thereunder deemed necessary to achieve its objectives, it must be concluded that the challenged administrative directive is contrary to statute and to public policy, as well, and was properly annulled by the courts below.
Order reversed, etc.