Morris **BASS** (residing at 120 Gale Place, Bronx, New York), et al., Plaintiffs,

v.

Elliott **RICHARDSON**, Secretary of the United States Department of Health, Education and Welfare, individually and in his official capacity, et al., Defendants,

**and**

City of New York and New York City Health & Hospitals Corporation, Plaintiffs-Intervenors.

No. 71 Civ. 4297.

United States District Court, S. D. New York.

Nov. 19, 1971.

Henry A. Freedman, Steven J. Cole, Adele M. Blong, New York City, Burr Hollister, Westbury, N. Y., David Diamond, Syracuse, N. Y., Michael Trister, Washington, D. C., for plaintiffs; Patricia Butler, Richard Froh, on the brief.

Whitney North Seymour, Jr., United States Atty., for the Southern District of New York, New York City, for the United States; David P. Land, Asst. U. S. Atty., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N. Y., for defendants Wyman and Department of Social Services; Steven M. Hochberg, Asst. Atty. Gen., of counsel.

J. Lee Rankin, Corp. Counsel, New York City, for plaintiffs-intervenors; James Nespole, Jesse I. Levine, New York City, of counsel.

## OPINION

COOPER, District Judge.

Plaintiffs move for a preliminary injunction to restrain cut-backs in benefits under the Medicaid Program of the State of New York and for determination of a class action. The motions are granted.

The plaintiffs have made a very strong showing of substantial probability of success at trial, clear and overwhelming irreparable injury which they will otherwise suffer, and the equities balance decidedly in their favor. Even were the showing of probability of success less compelling, which it in fact is, the balance of hardships is more than sufficient to warrant the issuance of an injunction. Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319, 323 (2d Cir. 1969); Dino De Laurentiis Cinematografica, SpA v. D–150, Inc., 366 F.2d 373, 375 (2d Cir. 1966); Hamilton Watch Company v. Benrus Watch Company, 206 F.2d 738, 740 (2d Cir. 1953).

This opinion [1] constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## Medicaid

New York State has a plan of medical assistance for eligible persons (Medicaid),[2] established in accordance with Title XIX of the Social Security Act, 42 U.S.C. § 1396 et seq., under which it receives federal matching funds for the costs of such program. The Federal Government has currently committed itself to the health of the residents in New York State through this plan to the extent of six hundred million dollars ($600 million); it thus meets fifty per cent (50%) of the total costs of the plan.

On April 14, 1971 New York State amended the Social Services Law by enacting Chapters 113 and 131 of the laws of 1971, to be effective May 15, 1971.[3] The new law sought to significantly and drastically infringe upon the availability of medical assistance by reducing the amount of income and resources an individual may have and hold and still remain eligible for Medicaid. Additionally, many medical services previously supplied would be eliminated for that category of recipients described as "medically needy," i. e. those individuals with incomes and resources above the cash public assistance level but below the level necessary to purchase essential medical services. Plaintiffs herein are "medically needy" persons. Among services which would be eliminated for plaintiffs and their class are:

(1) Dental care including dentist's services and dentures,

(2) Drugs,[4] biologicals, blood products and sick room supplies,

(3) Eyeglasses and prosthetic devices,

(4) Private duty nursing services,

(5) Optometrists' services,

(6) Podiatrists' services,

(7) Chiropractic services,

(8) Psychological testing,

(9) Rehabilitative therapies including physical, occupational and speech therapy or orthoptic training,

(10) Any diagnostic, screening, or preventive services not provided by a physician and not a laboratory or x-ray service.

Plaintiffs claim immediate irreparable injury will result from cut-backs they contend are unlawful.

## Prior proceedings

Implementation of cut-backs was restrained by a temporary restraining order of May 12, 1971 and a preliminary injunction of June 2, 1971 by Judge Tenney of this court on the ground, *inter alia*, that the prior approval of the Secretary of the Department of Health, Education and Welfare was an absolute prerequisite to amendments effecting state plan reductions under Section 1902(d) of the Social Security Act, 42 U.S.C. § 1396a(d), and that such approval had not been given. Bass et al. v. Rockefeller et al., 331 F.Supp. 945 (S.D.N.Y.1971). (*Bass I*).

By letters of September 15 and 16, 1971 (Plaintiffs Exhibits E and F) the Department of Health, Education and Welfare advised the State that such cutback had been approved. On September 16, 1971 the State similarly informed our Circuit Court (then considering the appeal from Judge Tenney's order) and on that date it remanded the case to the District Court with instructions to vacate the preliminary injunction and dismiss

1. The exigencies of time require a condensed statement of our opinion. In order to avoid repetition, reference will be made to the opinion of Judge Tenney relating to jurisdiction under 28 U.S.C. § 1331 and the legislative history.

2. Social Services Law, McKinney's Consol.Laws, c. 55, § 363 et seq.

3. Original plaintiffs Exs. A and B; see also Administrative letters 71–PWD–19 and 71–PWD–83, Ex. M.

4. Plaintiffs allege that the elimination of drug coverage will have a particular impact on the aged who rely on Medicaid as a supplement to Medicare (Title XVIII of the Social Security Act) which does not cover their drug expenses.

the case as moot. Judge Tenney so complied on September 21, 1971.

This action was subsequently filed (*Bass II*). We granted a temporary restraining order on October 22, 1971 to preserve the health of the medically needy recipients pending determination of the motion for a preliminary injunction, and extended the order November 1, 1971 upon good cause shown.

A motion to intervene by the City of New York and the New York City Health and Hospitals Corporation (returnable October 26, 1971) was granted November 3, 1971.

*Bass II* is clearly a separate action from *Bass I*. The sole issue treated in the Court of Appeals opinion was whether an approval of the Secretary of Health, Education and Welfare was a prerequisite to a state plan amendment under § 1902(d); with the approval by the Secretary that issue became moot. Jurisdiction and other issues were not discussed.

In this case, among new issues presented are: (1) whether the approval of the Secretary, which has now been given, complies with §§ 1902(d) and 1903(e) and (2) whether expiration of the suspension of § 1903(e) on July 1, 1971 completely bars any cut-backs in Medicaid. Neither of these issues presented a justiciable case or controversy at the time *Bass I* was filed.[5]

### Jurisdiction

■ There are multiple bases of federal jurisdiction. We share Judge Tenney's view that 28 U.S.C. § 1331 jurisdiction exists as to the class plaintiffs. *Bass I*, at 948–952. Snyder v. Harris, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed. 2d 319 (1969) is only intended to bar trivial cases of aggregation, cases which are "almost exclusively" *diversity* cases, from the federal courts. 394 U.S. 332, 341, 89 S.Ct. 1053. This case is not triv-

ial and it is not a diversity case. The right at issue is the proper administration of a program to which billions of dollars of federal funds have been committed and where Congress explicitly and repeatedly expressed concern that the program be rigorously and properly operated. If any case is proper for adjudication of important federal rights and issues of federal law by a federal court, it is this case.

Jurisdiction also exists as to the intervenors whose claims, amounting to millions of dollars, are far in excess of $10,000. We treat the pleadings of the intervenors as those of a separate action if such is even necessary. Hackner v. Guaranty Trust Co. of New York, 117 F. 2d 95 (2d Cir.), cert. denied, 313 U.S. 559, 61 S.Ct. 835, 85 L.Ed. 1520 (1941); 3B Moore's Federal Practice ¶ 24.16 [2] at 24–613, 24–613, n. 9.

Additionally, the federal government is a party under 28 U.S.C. § 1361 and 5 U.S.C. § 701 et seq., and ancillary jurisdiction exists as to the other parties. Wright, Law of Federal Courts, § 9.

The claims arise under 42 U.S.C. § 1396 et seq. and 42 U.S.C. § 1983.

### Class action

Plaintiff Morris Bass resides with his wife Esther in Bronx County, New York. He is 62 years of age, his only income is $171.50 per month Social Security and $75 per month from a union pension. Plaintiff's annual income is less than current Medicaid income eligibility levels and he is therefore qualified for medical assistance.

Mr. Bass suffers from Parkinson's disease. Expensive prescription drugs therefore cost $53 per month ($636 per year). Medicaid enables plaintiff to obtain these drugs. Prior to receiving the present medications, this plaintiff was unable to walk or speak in a comprehensible manner; he could not care for him-

---

5. In view of the strong showing of probability of success on the merits. as to the claim of non-compliance with §§ 1902 (d) and 1903(e) [(1), *supra*,] we will assume without presently deciding that cut-backs are not absolutely precluded under reinstated § 1903(e) [(2) *supra*].

self or leave his home. The direct result of his medication (including the drug L-Dopa) presents a sharp contrast, for he can now care for himself, walk, speak and perform numerous other tasks previously beyond his capacity. Cessation of this medication will return him to his previous painful and helpless condition.

The significance of Medicaid, and the individual and collective human suffering which it ameliorates, rehabilitates and forestalls, is illustrated by the sworn statement of plaintiff Bass:

"Medicaid is a lifesaver to me because I don't have the money to buy the drugs myself. Before I could get L-Dopa, I couldn't leave the house because I'd fall down when I walked, I used to tremble all the time, and nobody could understand me when I spoke. Now I can speak and walk without being afraid. I can now take care of myself, which I couldn't do before. I know that without L-dopa I'll be back to how I was before. I even think I may be worse off because I may be in what my doctor calls a more advanced stage of Parkinson's. Life is not easy now, but I don't even think about being without L-dopa." (Bass affidavit, September 24, 1971).

Now we come to plaintiff Barney Scardino, 62 years old residing with his wife Josephine in Bronx County, New York. Mr. Scardino also suffers from disabling Parkinson's disease, necessitating drug expenditures of approximately $31 monthly. With an annual income of less than $3000 he was eligible for Medicaid coverage.

Prior to receiving medication Mr. Scardino was unable to work or walk. With medication he was able to resume employment on a part-time basis. However, increased difficulties caused him to go on sick leave. Additional drugs have been prescribed and he hopes to return to work and so make whatever contribution his health, maintained with the assistance of vitally needed medication, will allow. Deprived of medication plaintiff in all probability would be rendered immediately unemployable, his condition degenerate to helplessness.

Another instance is presented by plaintiffs William and Genevieve Braster residing in Franklin Square, Nassau County, New York. Mr. Braster's net income is approximately $128 per week; Mrs. Braster receives $72 monthly in Social Security benefits.[6] Mrs. Braster suffers from a disabling stroke and requires the continual care of a home health aide alleged to cost approximately $250 per week.

Under Chapters 113 and 131 of the Laws of 1971, plaintiffs Bass and Scardino will no longer receive needed imperative medication for the simple reason that they will be unable to pay for it themselves. Under the amendments, plaintiffs Braster will no longer receive reimbursement for their drugs, and will receive no reimbursement for home health care unless they substantially increase their own contribution to the cost of these services.

■ We need elaborate no further; representation of the class is more than adequate and it is abundantly clear from the papers before us that a class action determination is appropriate under Rule 23.

*Statutes and Legislative History* [7]

The relevant statutory provisions are as follows:

§ 1903 Comprehensive care and services for eligible individuals by July 1, 1977

(e) The Secretary shall not make payments under the preceding provi-

---

6. They qualify for Medicaid because they incur monthly medical costs in excess of $425 a month thus reducing the available income below Medicaid eligibility levels. The remaining costs are shared 20%–80% by plaintiffs and Medicaid to the extent they are includable.

7. We incorporate the discussion of legislative history (which dealt with the need for approval prior to the expiration of the § 1903(e) suspension) in *Bass I*, at 15–20.

sions of this section to any State unless the State makes a satisfactory showing that it is making efforts in the direction of broadening the scope of the care and services made available under the plan and in the direction of liberalizing the eligibility requirements for medical assistance, with a view toward furnishing by July 1, 1977, comprehensive care and services to substantially all individuals who meet the plan's eligibility standards with respect to income and resources, including services to enable such individuals to attain or retain independence or self-care.

§ 1902 Modification; certification requirements

(d) Whenever any State desires a modification of the State plan for medical assistance so as to reduce the scope or extent of the care and services provided as medical assistance under such plan, or to terminate any of such care and services, the Secretary shall, upon application of the State, approve any such modification if the Governor of such State certifies to the Secretary that—

(1) the average quarterly amount of non-Federal funds expended in providing medical assistance under the plan for any consecutive four-quarter period after the quarter in which such modification takes effect will not be less than the average quarterly amount of such funds expended in providing such assistance for the four-quarter period which immediately precedes the quarter in which such modification is to become effective,

(2) the State is fully complying with the provisions of its State plan (relating to control of utilization and costs of services) which are included therein pursuant to the requirements of subsection (a) (30) of this section, and

(3) the modification is not made for the purpose of increasing the standard or other formula for determining payments for those types of care or services which, after such

modification, are provided under the State plan,

and if the Secretary finds that the State is complying with the provisions of its State plan referred to in clause (2); except that nothing in this subsection shall be construed to authorize any modification in the State plan of any State which would terminate the care or services required to be included pursuant to subsection (a) (13) of this section. Any increase in the formula or other standard for determining payments for those types of care or services which, after such modification, are provided under the State plan shall be made only after approval thereof by the Secretary.

§ 1902(a) A State plan for medical assistance must—

(30) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan as may be necessary to safeguard against unnecessary utilization of such care and services and to assure that payments (including payments for any drugs provided under the plan) are not in excess of reasonable charges consistent with efficiency, economy, and quality of care.

Congressional commitment to both § 1902(d) and § 1903(e) reflects the concern that a national program for health care is a prime and central objective for the United States as a nation in the next decade. While recognizing the need for some flexibility in enacting § 1902(d) and suspending § 1903(e), the § 1902(d) standards were made rigid and were to be strictly applied to effectuate the remedial purposes of the Act; Congress did not wish the goal of a *national* commitment to health problems to be compromised by state action. This would be particularly so upon the expiration of the suspension:

[A] new subsection (d) will be added which will permit states to reduce services only upon the conditions . . . *most importantly* that states undertake a program of cost control. Re-

marks of Senator Harris, Cong.Rec. 17704 (June 30, 1969) (emphasis added).

Senator Ribicoff similarly stated:

> Our purpose must be to control these rising costs and to tighten up program administration *without sacrificing* our national goals and without penalizing the recipients of medical assistance. . . . To cut services drastically in the face of rising costs would be charging the needy for the sins of medical service vendors.

Remarks of Senator Ribicoff, 115 Cong.Rec. 17703–17704 (June 30, 1969). (emphasis added).

As to the importance of cost control within the rubric of the national health care program, Senator Long, a leading proponent, made it abundantly clear that:

> "a state desiring to cut back services must certify—and the Secretary of the Department of Health, Education and Welfare must find—that it is actually employing effective controls on the costs of care and utilization on the various services provided." 115 Cong. Rec. 17702 (June 30, 1969).

See also 45 C.F.R. 250.20.

Before § 1903(e) was suspended, it in essence required the State, prior to receiving payments under the Act, to make a "satisfactory" showing (meaning facts) that it was making efforts to broaden the scope of care and services and in the direction of liberalizing eligibility requirements with a view toward furnishing comprehensive care and services to substantially all eligible individuals. As originally enacted, no mechanism was provided for reductions *within this framework.*

Under suspension of § 1903(e) and enactment of § 1902(d), the above criteria were replaced temporarily by those of § 1902(d). The Secretary did not have to find *inter alia* a showing of com-

prehensive treatment efforts in order to be "satisfactory" under § 1903(e), so long as the rigid requirements of § 1902(d) (included to insure against waste, maladministration, and squandering of federal funds) were met.

■ With the revival of § 1903(e), both sections co-exist and must be interpreted together, although each section has separate import. Axelrod & Co. v. Kordich, Victor & Neufeld, 451 F.2d 838 (2d Cir. 1971, at 842, n. 3).

■ It has now come to pass that the Secretary must make *two* independent findings before any reduced payments can be effected. He must first find that the State "*is fully* complying with the provisions of its State plan" in § 1902(d) (2); secondly, and before he may give approval, he must find that the State's showing is "satisfactory" that any such reduction, if effected, is fully in accordance with § 1903(e). Each finding is reviewable, and each finding was, in all probability, unwarranted in this case. Administrative Procedure Act § 10(d); 5 U.S.C. § 706(2) (F).

■ Particularly in the case of a reduction, the State has a heavy burden under § 1903(e) to show that it in fact is making efforts[8] to broaden the scope of care and services and to achieve the comprehensive goals of substantially full coverage.

When § 1902(d) alone was in force, the Secretary was only required to make a finding that § 1902(d) (2) relating to utilization review had been met.

However, under § 1903(e), the Secretary cannot make a finding that a state has made a "satisfactory" showing that the imperative requirements of Congressional design have been met without knowing whether *all* the requirements of § 1902(d) have been met. Under § 1903(e) the factual showing must be satisfactory to the Secretary

---

8. Speeches, messages to the legislature, defeated bills and the like are not evidence of "making efforts;" absent more, they may even be some evidence that requests to act are not being acted on; that State policy is either neutral or hostile to comprehensive coverage.

himself—not to the Governors. The Secretary is delegated by Congress with the responsibility for implementing a comprehensive federal policy. Had Congress intended that the Governors evaluate national health policy and pass on the sufficiency of their own States' submissions it would have so provided. Congress did *not* intend Governors to be such arbiters. In fact, Congress intended precisely the *opposite* and expressed its concern that States *not* be permitted to determine on their own whether their submissions were in conformity with federal law as to either utilization review or comprehensive national health policy. With the ultimate and real weapon of cutting off federal finding entirely, Congressional intent in § 1902(e) could not be clearer or stronger. While a factual showing of conformity to all of § 1902(d) standards is necessary before any reduced funding under § 1903(e) can be made, such a showing is not sufficient. The Secretary must apply the § 1903(e) standards to all the facts before him, including at a minimum facts warranting his conclusion that § 1902(d) has been satisfied. A conclusion that the requisite facts are presented is unwarranted.

■ Taken together, the initial "Certificate" approved September 15, 1971 and the subsequent "Certificate" dated October 4, 1971 and submitted October 26, 1971 are insufficient in two ways. First, as to each, there is no claim that § 1903(e) has been satisfied let alone any showing to that effect, and hence in themselves provide an insufficient basis for a Secretarial finding that § 1903(e) has been satisfied. We note that § 1903 (e) became effective prior to the September 15, 1971 approval. Secondly, there is no evidence that the October 4, 1971 "Certificate" has been approved— an absolute prerequisite to reductions. See *Bass I.*

*The appropriate test*

■ In short, it appears that a fourfold test is properly applied in analyzing this case under §§ 1903(e) and 1902(d):

(1) If the Secretary's approval of reductions and utilization review under § 1902(d) alone is probably [9] unwarranted, an injunction should issue prohibiting the State cut-backs. That is the situation in this case.

(2) Assuming an injunction issues under (1) and the program continues at the level prior to the amendments sought by the State: if a finding by the Secretary that the continued program level and other evidence before him probably meets the standards of § 1903(e), then no injunction against federal funding (assuming standing to raise the claim) is proper. That is so in this case. There is evidence of some utilization review activity although there is not full present compliance as § 1902(d) requires. See § 1903(e): ("The Secretary shall not make payments * * *").

(3) Assuming that reduction is proper within the terms of § 1902(d) alone: if the reduction injures the state program so that standards of § 1903(e) are not met and the Secretary's approval and finding to the contrary would probably be unwarranted, the State reduction cannot take effect and an injunction should issue prohibiting the State cut-backs. Even were a § 1902(d) reduction proper in this case (most emphatically it is not) the injunction would issue.

(4) Assuming that reduction is proper under § 1902(d) alone: if the reduction does not injure the State program sufficiently so that the standards of § 1903 (e) would not be met, and the Secretary's finding to this effect would probably be warranted, no injunction against federal funding should issue. This situation does not apply to the case before us.

9. An injunctive standard is probability of success at trial. This discussion assumes that the requisite showing of irreparable injury and balance of the equities, more than amply made in this case, have been established. Alternatively, the standards of *Checker Motors* and *De Laurentiis,* supra, are applicable. Our determination is made absent a hearing as the parties by letter waived such.

We regard the record overwhelming— top heavy in favor of plaintiffs. It leads to the conclusion that plaintiffs will probably be able to show that the strict utilization standards of § 1902(d) were not met [(1), *supra*] and that New York's proposed plan compromises the very national interest which Congress sought to protect in § 1903(e) [(2), *supra*].

### § 1902(d)

The Department of Health, Education and Welfare recognized the strict utilization requirements which the law *compelled* by issuing the following memorandum on June 11, 1971 (Policy Information Memorandum No. 13):

"SUBJECT: Minimum Utilization Review Requirements Acceptable to Medical Services Administration for States Operating Medical Assistance Programs Under Title XIX (List under *Medical Care*; file under HM 10)

We were asked to specify what the minimum utilization review requirements are. They were identified as follows:

1. The State must have established the responsibility for utilization review (UR) in the medical assistance unit of the single State agency.

2. The State must have developed and have available for Federal review a written UR plan which must be State-wide in application and cover all items of care and service included in the State's Title XIX plan.

3. The UR plan must describe how the State proposes to conduct reviews, which services are to be reviewed after care has been received, which are to be reviewed concurrent with care, which are to be reviewed before care is received (prior authorization), which are to be reviewed prior to payment and which after payment, which are to be reviewed on a sample or other basis and which inpatient

hospital stays are to be defined as long term.

4. The plan must describe the criteria to be used in the UR of each service to identify questionable or deviant cases or patterns of care and specify tolerance levels beyond which a case becomes an exception.

5. The plan must describe the procedures to be followed when cases become exceptions, including the appeal mechanism for provider or client.

█ The record before us does not support the finding that New York State has in effect a plan sufficient to meet the strict requirements of either § 1902 (a) (30) or 45 C.F.R. 250.20, Plaintiffs' memorandum, pp. 37–45. However, even if it had, we find the evidence before us fails to show that utilization review had been properly implemented at any stage. Several letters indicate that prior to May 28, 1971, there was unquestionably no utilization review implementation; there was not even an arguable plan. Smith letters, to Wyman, April 28, 1971 and May 20, 1971.

A most persuasive document is the sole written report to Commissioner Smith by his staff's on-site April and May 1971 visitations—a document categorically denied to plaintiffs (notwithstanding the spirit of the Freedom of Information Act and the importance to the proper resolution of this case) until this Court (without any knowledge of the contents of the document) interceded.

It is apparent from this report that New York's utilization review program, even to a charitable eye, is woefully inadequate under federal law:

"[N]o reports of any utilization review activities by local or area offices were available in [the State offices].

\* \* \* \* \* \*

"Except for the requirements for prior authorization for specific items of care, no formalized utilization procedures were found to be implemented uniformly in the districts reviewed.

. . . [I]t was found in districts reviewed that there is essentially no formal utilization review activity performed prior to the payment of bills. In many districts the claims clerks use their judgment and experience to assess utilization proprieties in the absence of any guidelines or defined procedures which would assure a degree of uniformity."

\* \* \* \* \* \*

". . . Erie County [Buffalo] and New York City had neither recipient nor vendor profiles. Without profiles it is virtually impossible to determine the extent to which recipients are using Medicaid services, the types of services they are receiving and the patterns of practice exhibited by the different providers in the program."

\* \* \* \* \* \*

"Perhaps the major problem in the districts which do have computer capability to produce vendor/recipient profiles is that there is no specific criteria (sic) used in requesting these profiles . . . In none of the districts visited was there evidence of claims being separated out either prior to or after payment of the bill so that the local medical director can carry out the reviews which are his responsibility.

Interviews with local medical directors during the Federal Review revealed that their utilization review activities including surveillance of utilization reviews performed by institutions are on a sporadic basis. The local medical directors are not following any State-wide guidelines for conducting or reporting utilization review activities. There appears to be no periodic reports of local U.R. activities required either by the Regional or Central Office of the State Health or Social Services Department.

In some of the districts attempts have been made to implement a utilization review program and in other districts reviews of specific services being provided to Medicaid patients have been undertaken by local medical directors. . . .

\* \* \* \* \* \*

"Recent audits and reviews . . . revealed the over-utilization of nursing home beds by Medicaid patients not in need of skilled nursing care. The lack of utilization review activities must be assumed as a result of these findings." (Ex. 3, Deposition)

No sufficient facts are presented to warrant a change in the conclusions of Commissioner Smith's own staff since issuance of the report. No explanation was offered, nor can we understand how the very strict federal requirements to avoid waste of funds can be met, by clerks who make decisions without sufficient guidelines or criteria (Deposition, p. 44), and non-uniform application of criteria (Deposition, p. 13). We are not shown facts to suggest that vendor or provider profiles had been developed or used, or that proper monitoring of utilization review activities was in existence.

"Q. Were there any such reports in those offices as of September 3, 1971?

"A. I don't know. I can't answer that question.

"Q. Do you know if the state as of September 3, 1971 was gathering such reports from all of the districts?

"A. I don't know." (Deposition, p. 41)

\* \* \* \* \* \*

Q. "To your knowledge, does the state now have any precise knowledge as to the utilization review plans or activities in any district or in various districts other than that contained in the information furnished in their submittals to you which you have previously provided to us?"

A. "*I don't know what the state knows about it; I couldn't answer that.*" (Emphasis added) (Deposition, p. 49)

We respectfully question how Commissioner Smith, albeit well-intentioned, could have made a finding that utilization review was consistent with federal law absent knowledge of the status of state control and knowledge of its utilization review plans or activities.

We regard the evidence from the Department of Health, Education and Welfare record quite sufficient. There is more. The affidavit of Dr. Lowell E. Bellin, First Deputy Commissioner of the New York City Health Department (September 29, and October 19, 1971) and the uncontroverted letters from Montefiore and Mount Sinai Hospitals (Freedman affidavit, Exs. 1 and 2, October 5, 1971) are most compelling. Simply stated, the stringent requirements of § 1902(d) have not been met.

### § 1903(e)

Even if the standards of § 1902(d) were met in this case—and on the record before us they decidedly have not been—the reduction would violate § 1903(e).

The proposed cut-back amounts to $160 million. Hundreds of thousands of people will be affected. Extremely vital health services would be eliminated wholesale and regardless of need.

■ This is in no sense a cut-back of "minor," "temporary" or "incidental" nature. This is a massive, wholesale rearrangement of the medical health system in the State of New York. The record is absolutely barren of facts to indicate in any way that New York State has any intention by legal commitments or other means of restoring these cutbacks before July 1, 1977. The State may fervently hope for the repeal of § 1903(e) before 1977. That, however, does not meet the test of broadening health care and is not a sufficient basis to avoid present compliance. As we have noted, a State seeking a cut-back has a heavy burden under § 1903(e). Even the most solemn of promises is insufficient here without precise legislature commitment of at least sources of funds, if not the actual funds.

\* \* \* \* \* \*

■ As the facts regarding the named plaintiffs clearly shows such to be the case, we conclude a clear balance of hardship exists in favor of plaintiffs. Fifty dollars monthly can mean the difference between relative comfort and a life of utility for one who faces an otherwise grim and painful future. The State cannot prevail on the balance of incredible human suffering which the amendments to this program would create. The injury to those whose health is maintained on the slenderest chemical balance provided through medication is not merely irreparable; it is ultimate. The record additionally supports a finding of irreparable injury to the interests of the intervenors.

It is Congress and not this Court which has determined that the problems of health and aging are not limited to the infirm and aged, and that efforts to sustain life must be accompanied by a national effort and means to prolong it humanely and with dignity.

We must stand fast to our insistence that the laudable objectives of the federal legislation with which we deal here are not dissipated in the least—not alone by improper purpose of evasion or avoidance, but by equally destructive results induced by indifference, carelessness, indecision or inadvertence.

The injunction shall issue.

Settle order on one (1) day notice.

### Supplemental Opinion

On November 11, 1971 we granted a preliminary injunction against cut-backs of the New York State Medicaid Program for violation of Sections 1902(d) and 1903(e) of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a(d) and 1396b(e).

■ Our order contains no provision for a bond for the reasons stated herein.[1]

---

I. This question was not briefed and the parties first presented this issue by let-

ters of November 8 and 9, 1971. We advised them the most appropriate way

Fed.R.Civ.P. 65(c) provides:

(c) *Security.* No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained. No such security shall be required of the United States or of an officer or agency thereof.

Five (5) possible situations arise here:

(I) The class plaintiffs must provide all or part of the security in an amount to be determined; this we regard improper.

 It is clear to us that indigents, suing individually or as class plaintiffs, ordinarily should not be required to post a bond under Rule 65(c). "Poor persons * * * are by hypothesis unable to furnish security as contemplated in rule 65(c), and the court should order no security in connection with this preliminary injunction." Denny v. Health and Social Services Board, 285 F.Supp. 526, 527 (E.D.Wis.1968) [Three Judge Court].[2]

 (II) The full amount of any "costs and damages" suffered by the defendants because of and during the pendency of the injunction,[3] including payments made to the class plaintiffs; this likewise is improper. The class plaintiffs do not have an obligation under the law to furnish security, as we have noted. Mere entry into a lawsuit as a co-plaintiff[4] does not mandate that the in-

tervenors fulfill a non-existent obligation of one with whom they are not in privity.

(III) The amount attributable to the benefit which the intervenors alone will derive; there is no basis for a bond under this alternative.

Rule 65(c) envisions that security is to be provided by the party who will be unjustly enriched by an error of the Court in order to make the party against whom an injunction issues whole for "costs and damages" occasioned thereby. The party most assisted during the present injunction is the class plaintiffs, not the intervenors. The class plaintiffs will receive direct cash payments of State money, not the intervenors. Only when the cut-backs approach substantial implementation would the interests[5] of the intervenors be compromised. The implementation process takes considerable time, especially in New York City where the intervenors are situated and affected. Accordingly, the intervenors may receive few additional benefits above what they would otherwise in fact receive for the duration of the injunction (as opposed to subsequently).

Even if the intervenors were to derive some benefit, there is no allegation or showing of the amount of such benefit to the intervenors or a corresponding damage to the State.[6] Any such costs and damages during the temporary delay occasioned by the preliminary injunction are therefore wholly speculative and thus present no sound basis for a bond. Powelton Civic Home Own. Ass'n v. Department of H. & U. Dev., 284 F.Supp. 809, 840 (E.D.Penn.1968).

(IV) A bond in a nominal amount; this would be improper.

---

of treating the question would be "settle order" so as to permit the parties and the court to examine the matter further. We have received no additional papers from the parties.

2. No bond was requested or granted in *Bass I.* The class plaintiffs and their representatives were the sole plaintiffs there. Even were this not so we would require no bond under alternative I.

3. 7 Moore's Federal Practice ¶¶ 65.09, 65.10 [1].

4. This analysis would be the same whether the co-plaintiffs were intervenors or initial plaintiffs in this case.

5. See Memorandum granting motion to intervene, November 3, 1971.

6. The Federal Government has not sought a bond or joined in the State's application.

The standard under Rule 65(c) is to protect the party against whom the injunction runs against costs and damages occasioned thereby. Failure to establish or even generally gauge such a standard does not assist the Court in establishing a figure. A nominal bond, absent a valid reason for requiring it, is a formality which will not provide any meaningful protection for the State against "costs and damages" occasioned by the injunction in this case.

(V) No bond; this we regard the proper disposition.

Absent any measure of the amount the intervenors should provide in a bond, it might well be an abuse of our discretion in making a serious determination as to what is "proper" to arbitarily set some figure. While mere difficulty of determination in no way relieves a Court of its duty under Rule 65(c), we do not believe it our function to establish sums which are wholly speculative.

██ A far more important reason exists. Section 1902(d) and especially Section 1903(e) and the Legislative history unmistakably demonstrate Congressional intent that the programs thereunder be vigorously and properly administered.[7] Public policy under §§ 1902(d) and 1903(e) mandates that parties in fact adversely affected by improper administration of programs pursuant thereto be strongly encouraged to correct such errors; a bond might discourage some municipalities from correcting serious or flagrant abuses.[8] Large, unlawful cutbacks create large "costs and damages" and these are precisely the cases which should be rectified undiscouraged by a bond. The injunctive standards of probability of success at trial, irreparable injury and balance of the equities provide protection against frivolous actions. If any difference exists between the language of Rule 65(c) and Congressional intent clearly embodied in the remedial statutes at issue, the federal statutes control. On the issue of a bond in this case, the allocation of risk for not complying with federal law in a comprehensive program to promote national health, where Congress has firmly spoken, properly rests upon the defendant governmental bodies whose administration of the program is at issue.

Accordingly, no bond is required.

So ordered.

## MEMORANDUM ON MOTION TO INTERVENE

Motion to intervene granted as to each applicant. Fed.R.Civ.P. 24(a) (2) and (b).

██ Applicante have standing to sue. Flast v. Cohen, 392 U.S. 83, 101, 88 S. Ct. 1942, 20 L.Ed.2d 947 (1968); Commonwealth of Pennsylvania v. State of West Virginia, 262 U.S. 533, 564–565, 43

---

7. The Department of Health, Education and Welfare recognized the forcefulness of Congressional insistence in implementing § 1903(e) with the following regulation:

 "[State plans must] [p]rovide for broadening the scope of the medical and remedial care and services made available under the plan to the end that, by July 1, 1975, comprehensive medical and remedial care and services will be furnished to all eligible individuals. 45 C.F.R. § 249.10(a) (8)."

 This was interpreted as requiring States to take "no progressive steps in the direction of a comprehensive scope of medical care and services for families and individuals whose limited income and resources are insufficient to purchase them," which required in turn that "State efforts must be evident in the following areas until appropriate goals are reached: * * *

 2. Broadening the scope of services made available.

 3. Liberalizing of eligibility requirements to admit additional low-income families and persons to the program." The "appropriate goal" of "comprehensive . . . care" was defined as including "all preventive, diagnostic, curative and rehabilitative services or goods . . . furnished, prescribed or ordered by a recognized practitioner of the healing arts within the scope of his practice." HEW Handbook of Public Assistance Administration, Supp. D, §§ D–1100, D–5142.

8. This detriment would be particularly severe where private counsel is not readily available to indigent class plaintiffs.

**492**

S.Ct. 658, 67 L.Ed. 1117 (1923); Citizens Committee for Hudson Valley v. Volpe, 425 F.2d 97, 102–106 (2d Cir. 1970); Scenic Hudson Preservation Conference v. Federal Power Commission, 354 F.2d 608, 616 (2d Cir. 1965); City of New York v. Wyman, 66 Misc.2d 402, 419–420, 321 N.Y.S.2d 695, aff'd 37 A.D. 2d 700, 322 N.Y.S.2d 957 (1st Dept. 1971).[1]

Applicants have interests to protect in this litigation—interests which are not the same as those of plaintiffs: full finding and utilization review for the purpose of either reducing costs or upgrading over-all health coverage of recipients, resulting in the preservation of tax levies not appropriated for Medicaid and freeing them for such other needs as transportation, education and other essential social services—all to the benefit of the majority of citizens who are non-recipients;[2] the interest of the municipality in preserving the general health of the population as a fundamental element of the public interest, Cascade Natural Gas Corp. v. El Paso Natural Gas Co. et al., 386 U.S. 129, 132–136, 87 S.Ct. 932, 17 L.Ed.2d 814 (1966); 3B Moore's Federal Practice ¶ 24.09–1 [1] which includes preserving the health of persons who, due to age and ill-health accompanied by poverty, are especially vulnerable, and thus avoid a heavy strain on both the fragile health of recipients and the resources of municipal health institutions in the event neglect precipitates health failures. N.Y. Public Health Law § 2805–a, McKinney's Consol.Laws c. 45 N.Y. Unconsolidated Law § 7382.

Representation is inadequate under Rule 24(a) (2). Applicants, with their intimate knowledge of procedures in the area which they themselves administer (as opposed to receiving benefits), are in a unique position to inform the Court as to the factual matters with which it must deal in deciding this case, and also to succinctly present and protect their position. Applicants have specific records and data in readiness; plaintiffs may not even know of their existence.[3] Cf. 3A Moore's Federal Practice § 24.09–1 [4] at 314–16.

We additionally find intervention appropriate under Rule 24(b), for we deal with claims or defenses presenting common questions of fact and law far beyond mere general interest. 3 B Moore's, *supra*, ¶ 24.10 [2] at 24–352. We are convinced that intervention will not unduly delay the disposition of this case or prejudice the adjudication of the rights of the original parties.

So ordered.

---

1. N.Y.Unconsolidated Laws § 7401(3) does not in any way alter our conclusion. There is no case authority or legislative history offered to suggest that this is not a capacity and venue statute alone. If we assume the legislature intended to bar the applicants from the federal courts by this provision, the intention cannot be given effect. Wright, Law of Federal Courts, (1970 Ed.) ¶ 46 at 174–77.

2. Recipients would also derive benefit thereby although not in their capacity as recipients.

3. *Compare* Bellin affidavit, September 29, 1971 and Budoff affidavit, September 28, 1971 [plaintiffs] *with* Bellin affidavit October 19, 1971 and Budoff affidavit, October 19, 1971 [applicants].