In the Matter of JOHN L. SHORT, Appellant, v NASSAU COUNTY CIVIL SERVICE COMMISSION, Respondent.

Second Department, October 11, 1977

*Bodell & Magovern, P. C. (David H. Berman* and *Frederick J. Magovern* of counsel), for appellant.

*William Gitelman, County Attorney (William S. Norden* of counsel), for respondent.

*Per Curiam.* The petitioner, an accounting executive with the Nassau County Department of Social Services, was dismissed from his position on the basis of two charges which were brought against him for (1) "misconduct and insubordination prejudicial to the discipline, good order and efficiency

of the Department of Social Services" and (2) "dereliction of duty prejudicial to the discipline, good order and efficiency of * * * [his] employment."

The filing of these charges against petitioner was precipitated by his refusal to certify that approximately 10 million dollars of county expenditures qualified for Federal and State reimbursement. In withholding his certification from these claims of the county for reimbursement, petitioner took the view that they included expenditures for the dispensation of and the instruction in the use of intrauterine devices (IUDs) which were, he claimed, not contraceptive in nature, but were abortifacients and that, therefore, these claims were not reimbursable under the law as set forth by the New York State Court of Appeals in *Matter of City of New York v Wyman* (30 NY2d 537).

The first charge filed against petitioner contained eight specifications and the second charge contained three specifications.

After a hearing, the hearing examiner, on July 21, 1972, sustained four specifications of Charge 1 and two specifications of Charge 2. Thereafter, on July 24, 1972, petitioner was dismissed from his position by the Commissioner of the Nassau County Department of Social Services. Petitioner then appealed to the respondent Nassau County Civil Service Commission pursuant to section 76 of the Civil Service Law. The commission, by decision dated December 13, 1972, sustained petitioner's dismissal. In doing so it sustained only Specifications 1 and 3 of Charge 1 and Specifications 1 and 2 of Charge 2. Since these specifications are duplicative, it is clear that only two distinct specifications or incidents were utilized by the commission to sustain petitioner's removal: (1) that on March 9, 1972 he circulated a written memorandum stating that the salaries of personnel involved in abortion referrals in the Nassau County Medical Center Family Planning Center be deleted from all claims for State and Federal reimbursement (Charge 1, Specification 1 and Charge 2, Specification 1) and (2) that on April 19, 1972 he refused to sign and certify with the New York State Department of Social Services a claim for reimbursement of approximately $10,000,000 in expenditures made by the County Department of Social Services for assistance and services which included the furnishing of IUDs (Charge 1, Specification 3 and Charge 2, Specification 2).

Petitioner then instituted a proceeding pursuant to CPLR article 78 to review the determination of the respondent commission.

Without having interposed an answer and return, the respondent moved to dismiss the proceeding on the ground that its decision was final and conclusive. The Special Term granted the motion and dismissed the petition on the merits.

In upholding the respondent's dismissal of petitioner from his position, the Special Term initially characterized petitioner's function as merely "administering and enforce[ing] fiscal requirements." It held that petitioner could not point to any "statute, State regulation or bulletin, or County directive" or any other "legal authority" to support the proposition that IUDs were "legally proscribed abortifacient[s]" for which the county could not be reimbursed, and that in the absence thereof, petitioner was required to obey the directive of his superior, the County Commissioner of Social Services, which was allegedly in accordance with local agency policy and which petitioner in fact received, to process and certify claims for reimbursement of expenditures made by the county in furnishing IUDs.

With respect to petitioner's reliance on *Matter of City of New York v Wyman* (30 NY2d 537, *supra)* the Special Term noted that subsequent to the decision in *Wyman,* a three-Judge Federal court struck down the Nassau County Medical Center's denial of nontherapeutic abortions to Medicaid recipients as violating Federal statutory requirements (see *Klein v Nassau County Med. Center,* 347 F Supp 496).*

The Special Term also noted that the County Department of Social Services, shortly after the *Wyman* decision, issued a departmental memorandum designating a named doctor at the medical center to whom all abortion referrals were to be made for review of the therapeutic need for the surgical procedure, and that petitioner "totally disregarded this avenue of investigating supposed nontherapeutic abortions".

Finally, in rejecting petitioner's argument that his punishment was excessive, the Special Term described petitioner's conduct in attempting to officially implement his own beliefs

---

* It should be noted that on June 20, 1977 the United States Supreme Court held that States were not required to pay for elective or nontherapeutic abortions (see *Beal v Doe,* 432 US 438).

as "persistent", "substantial, deliberate, defiant and as yet unrepented."

At the outset, the respondent contends on appeal that section 76 of the Civil Service Law provided the petitioner with an election of remedies for appealing the determination of the County Commissioner of Social Services and that by electing to appeal to the Civil Service Commission rather than proceeding by way of a CPLR article 78 proceeding, petitioner was bound by the decision of the Civil Service Commission which, according to the language of the statute was "final and conclusive, and not subject to further review in any court" (Civil Service Law, § 76, subd 3). However, as the Special Term correctly noted, there is "nonetheless continuing judicial review, if on a diminished scope" of determinations made by appropriate civil service commissions. Judicial review in these situations is limited to determining whether the dismissal is "purely arbitrary" (see *Matter of Levitch v Board of Educ.*, 243 NY 373, 375; *Matter of Ross v Wilson*, 308 NY 605, 608; *Matter of Hibbert v New York City Tr. Auth.*, 28 AD2d 1139, mot for lv to app den 22 NY2d 643, cert den 393 US 1035; *Matter of Santella v Hoberman*, 29 AD2d 655; *Matter of Pauling v Smith*, 46 AD2d 759).

We have reviewed the entire record and conclude that the commission's sustaining of Charge 1, Specification 3 and Charge 2, Specification 2 was purely arbitrary. We further conclude that the commission's sustaining of Charge 1, Specification 1 and Charge 2, Specification 1 was proper, but that the penalty of dismissal was so disproportionate to the offense as to shock our sense of fairness. Accordingly, the penalty imposed should be reduced as hereinafter set forth.

Before detailing the factual background of this matter, a procedural point must be resolved.

Since the article 78 proceeding was dismissed upon motion, without the filing of an answer and return, the record on appeal perfected by petitioner does not contain the transcript of the disciplinary proceeding or relevant exhibits. However, a review of the papers filed in the article 78 proceeding, the decision of Special Term and the briefs of the parties on this appeal indicate that the entire record was relied on by the parties for a decision on the merits. Accordingly, this court requested that the parties furnish the transcript and all relevant exhibits, which was done. We, therefore, have treated this proceeding as though the commission had filed a formal

answer and return and have rendered our decision accordingly.

Petitioner was employed by the County of Nassau as an accounting executive, a civil service position, which he occupied since 1969. Pursuant to this title, petitioner was the chief fiscal officer of the Nassau County Department of Social Services. Among his duties was the responsibility for certifying that claims for Federal and State reimbursement for medical procedures funded by Medicaid were made in accordance with applicable statutes and regulations. Clearly, petitioner was not the fiscal robot described by the Special Term, but was a person upon whom rested the "general obligation" (conceded by the Special Term) to insure that all claims for reimbursement were legal and appropriate. During the period from 1969 to early April, 1971 petitioner performed his duties in an exemplary manner and properly certified all claims for reimbursement for county expenses incurred in the furnishing of contraceptive devices and abortions, both medically indicated and elective.

On April 8, 1971, the State Commissioner of Social Services issued a written directive limiting reimbursement from Medicaid to "medically indicated" abortions only. This directive was immediately challenged in court and in rapid succession, the Special Term and the Appellate Division, by decisions dated May 18, 1971 and July 1, 1971, respectively, sustained the challenge and held that the State Commissioner's directive was unconstitutional (City of New York v Wyman, 66 Misc 2d 402; City of New York v Wyman, 37 AD2d 700).

Despite his personal conviction against abortions, and contrary to Special Term's characterization of petitioner as defiant and persistent in his attempt to convert his personal beliefs into official policy, petitioner obeyed the mandate of these decisions and continued to process claims for expenses relating to the furnishing of contraceptive devices and abortions, both medically indicated and elective.

During the pendency of a further appeal by the State Commission of Social Services to the Court of Appeals, the Department of Social Services issued a directive on September 9, 1971 relating to the subject of family planning. That directive advised the County Departments of Social Services that, pursuant to statute (Social Services Law, § 131-e), they were required to designate appropriate members of their staffs to "advise eligible needy persons periodically of the availability

at public expense of family planning services for the prevention of pregnancy". The salaries of all personnel involved in this family planning service were to be reimbursed by Medicaid.

On February 10, 1972, the Court of Appeals in *Matter of City of New York v Wyman* (30 NY2d 537, *supra)* reversed the two lower courts and upheld as constitutional the commissioner's directive limiting Medicaid reimbursement for abortions to those which were medically indicated only.

The significance of the Court of Appeals' decision in *Wyman* was twofold. Firstly, from that point on, elective or nonmedically indicated abortions were not reimbursable. Secondly, the decision in *Wyman* clearly imposed an obligation upon petitioner, in accordance with his duties, to insure that any procedure which could arguably be considered an elective abortion, or in the nature of an elective abortion, be subjected to close legal scrutiny to determine its exact nature and whether it was a reimbursable procedure.

The Nassau County Department of Social Services, itself realizing the import of *Wyman* and the crucial distinction between medically necessary and elective abortions, implemented the latter decision by issuing a departmental memorandum on February 24, 1972 (only 13 days after *Wyman* was handed down) designating a named doctor at the County Medical Center to whom all medical claims for abortions were to be referred for the purpose of determining the medical need for such surgical procedure.

For his part, petitioner acted on this point by issuing a directive on March 9, 1972 ordering that the salaries of all Department of Social Services personnel stationed at the Nassau County Medical Center who were making referrals of elective abortions be deleted from the county's claim for reimbursement from the State and Federal Governments. It is this directive which serves as the basis for the third specification of Charge 1 and the second specification of Charge 2, which were sustained by the commissioner.

Contrary to the statement of the dissenting Justice herein, the language of the March 9, 1972 memorandum circulated by petitioner, as a whole (including that part quoted by the dissenter), clearly indicates that it was limited to referrals for elective abortions for Medicaid patients. In the memorandum petitioner speaks of "birth control abortions since they are not necessary and medically indicated care for either the mother

or the unborn child" and the illegal use of "Medicaid funds for such abortions". Petitioner then goes on the state that the subject referrals were "contrary to stated policy as was the use of Medicaid funds for such abortions". At the very most, petitioner's memorandum of March 9, 1972, which was done at his initiative, can be described as an overzealous and broad application of the *Wyman* decision.

The record indicates that petitioner's superior, the County Commissioner of Social Services, countermanded petitioner's directive several days later. The matter was then immediately dropped. Clearly, under these circumstances, petitioner's act of issuing the directive of March 9, 1972 did not constitute insubordination or dereliction of duty. His conduct in this instance cannot be equated with his refusal to obey his superior's order on April 20, 1972 to certify claims for reimbursement of expenditures made by the county in furnishing IUDs. Furthermore, not a scintilla of proof was offered to sustain the findings of the commission that petitioner's conduct in issuing the directive of March 9, 1972 prejudiced the "discipline, good order and efficiency of the Department" or his "employment".

Petitioner, in addition, was apparently even more troubled by the question of IUD devices. It was his view that IUDs were abortive in nature. Contrary to the statement of the respondent that "there is no proof to demonstrate that any portion of the claim was improper", the only medical evidence presented supported petitioner's position. At no point, however, did petitioner let his personal convictions interfere with the good faith performance of his duties, since it is undisputed that he continued to certify all medically indicated abortions for reimbursement.

Contrary to the suggestion of the Special Term that petitioner engaged in a defiant and persistent course of conduct based on his personal convictions alone, the record indicates that petitioner, armed with supporting medical data, sought guidance and legal advice from appropriate officials in the county on the issue of whether IUDs were abortifacients, but to no avail. Moreover, since the department's directive of February 24, 1972 designating a doctor to determine the medical need for any particular abortion claimed as a reimbursable expense was not meant to, and did not, cover IUD referrals, it is clear that the Special Term erred when it stated that petitioner disregarded this service in his attempt to find an answer to his dilemma about IUDs.

Petitioner testified before the respondent that he met with a named attorney in the office of the County Attorney who agreed with his conclusion about IUDs and told petitioner that he would attempt to get the County Commissioner of Social Services and the latter's attorney to issue statements on the subject; in the absence of any forthcoming statements, petitioner was told to do what he considered appropriate.

On April 12, 1972 petitioner sent a memorandum incorporating his questions on this matter and requesting guidance to the Nassau County Executive, the Board of Supervisors of Nassau County and the County Commissioner of Social Services. In response to his formal request for guidance, petitioner received replies from the County Attorney on April 17, 1972 and the Commissioner of Social Services on April 19, 1972. Neither response addressed itself to petitioner's queries. The County Attorney's response merely restated what everyone knew already as a result of *Wyman,* i.e., that elective abortions were not reimbursable means for family planning. The response from the commissioner was similarly uninformative, merely charging petitioner with injecting his personal beliefs into the discharge of his duties and directing him to approve all claims submitted to him without question.

On April 19, 1972 petitioner sent the commissioner the memorandum which serves as the basis of Specification 1 of both Charge 1 and Charge 2, for which he was found guilty and dismissed. In that memorandum petitioner indicated that he was declining to certify the claims for reimbursement for the month of March on the ground that they included devices, including IUDs, which were abortive in nature.

In concluding his memorandum, petitioner stated "before * * * I * * * could sign, it would be necessary that this question be resolved and if neither department can state positively that such devices are in no possible way abortive, such devices * * * must be removed from the Family Planning program. I await your replies."

Petitioner's concern about this issue was deepened by the fact that as part of the claims that he processed he was required to "certify that this expenditure has been made in accordance with the provisions of the applicable statute".

On April 20, 1972 petitioner was called into the office of the County Commissioner of Social Services and was requested to sign the certification for the March, 1972 expenditures, which were approximately $10,000,000. Petitioner was advised that

no abortive devices were being used in the family planning program and that all devices and materials included in the program were contraceptives which conformed to State law and regulations.

The commissioner testified at the hearing that his directive to petitioner to certify the claims for IUDs was based on the opinion of "medical consultants and by the state" that IUDs were merely common birth control devices and not abortifacients and that petitioner nevertheless refused to certify the claims. He was suspended that very day by the commissioner. However, it must be noted that the commissioner did not produce, either during his conversation with petitioner or during the hearing before the commission, any witness or specific legal authority to buttress his directive to petitioner. Nor was there in existence at that time any written statement of the commissioner's policy on the issue raised by petitioner. Moreover, the record indicates that the county did not lose any money as a result of petitioner's conduct. Under established procedure, the county commissioner had the authority to sign the certification, and in fact did so. On the argument before the Civil Service Commission, the County Attorney stated "it is true that we did not lose the $10 million * * * because the Commissioner * * * had the right to sign it".

Although a finding of guilt against the petitioner for failing to obey the commissioner's order of April 20, 1972 to certify the county's claim for reimbursement cannot be described as purely arbitrary, it is our view that the penalty imposed on petitioner for the charges filed against him should be reduced to a one-year suspension.

We are aware of the decision of the Court of Appeals in *Matter of Pell v Board of Educ.* (34 NY2d 222, 233), which restated the well-settled principle that this court may not set aside or otherwise interfere with punishment or discipline imposed by an administrative agency unless it is "so disproportionate to the offense, in the light of all the circumstances, as to be shocking to one's sense of fairness" (see *Matter of Stolz v Board of Regents,* 4 AD2d 361, 364).

It should be noted, however, that in *Matter of Pell,* the Court of Appeals, in reversing this court's modification of sanctions imposed by a board of education, reinstated the board's determination dismissing a tenured teacher who falsely certified that he was ill and accepted pay for his unauthorized absence. Similarly, in all the cases decided with

and since *Matter of Pell,* there has existed moral turpitude, outright fraud and deception, serious threats to public safety, contravention of public policy and State law, untrustworthiness, direct conflict of interest or other aberrations and nefarious practices which totally supported the administrative sanction in each individual case (see, e.g., *Matter of O'Connor v Frank,* 38 NY2d 963; *Matter of SMC Employers Corp. v Workmen's Compensation Bd.,* 39 NY2d 960; *Kostika v Cuomo,* 41 NY2d 673).

Clearly, the " 'shocking to one's sense of fairness' test" is "somewhat [of an] amorphous nature" *(Kostika v Cuomo, supra,* p 676), and the propriety of the sanctions imposed by the administrative agency must necessarily rest upon the facts of each individual case. However, in *Pell* the court provided certain helpful guidelines which must be taken into account in evaluating the sanction imposed. The court there stated (p 234): "[I]t may be ventured that a result is shocking to one's sense of fairness if the sanction imposed is so grave in its impact on the individual subjected to it that it is disproportionate to the misconduct, incompetence, failure or turpitude of the individual, or to the harm or risk of harm to the agency or institution, or to the public generally visited or threatened by the derelictions of the individuals. Additional factors would be the prospect of deterrence of the individual or of others in like situations, and therefore a reasonable prospect of recurrence of derelictions by the individual or persons similarly employed."

Applying these guidelines to the case at bar, it is our view that petitioner's actions, while perhaps injudicious, hardly mandate the visitation of such complete devastation as outright dismissal.

Petitioner, acting on the mandate of *Wyman,* and in accordance with his duties, raised a proper question regarding the propriety of submitting claims for reimbursement for expenses incurred in furnishing IUD devices which a segment of respected medical opinion considered abortive in nature. He asked for legal guidance on this highly charged issue and, in all fairness, he should have received an answer based on either specific legal authority or a written statement of policy. What he in fact received from his superior was an oral directive to certify the claims. Although the commissioner had the authority to issue this directive, he failed to give petitioner any specific basis for the order apart from a general

and conclusory statement that he had legal and medical support for it. The county did in fact eventually receive all the moneys due to it despite petitioner's refusal to certify the claims.

Moreover, there was abundant evidence adduced at the hearing before the respondent that petitioner had an excellent and unblemished record. He worked diligently at his job, putting in many overtime hours and instituting procedures expediting the payment of claims and saving the county money. The record indicates that morale of petitioner's staff was exceptionally high until his suspension, when morale went down and the backlog of claims went up.

Finally, it should be noted that petitioner also brought a proceeding in 1973 pursuant to section 298 of the Executive Law alleging that he had been dismissed from his position as a result of discrimination practiced against him. In affirming the dismissal of that proceeding on the merits, this court nevertheless stated that "[w]hile outright dismissal of petitioner from his position as Accounting Executive in the Department of Social Services after years of service with the County of Nassau seems harsh, we cannot in this proceeding be of any help to him" (Matter of Short v State Division of Human Rights, 44 AD2d 557, 558).

Under all of the circumstances herein, the punishment imposed upon petitioner should be reduced to a one-year suspension.

Accordingly, any back pay due to petitioner should commence as of April 21, 1973, the day following completion of the one-year suspension imposed herein. However, the record indicates that petitioner exhausted his administrative remedies and even managed to secure a decision from the Special Term by early April, 1973. A notice of appeal was filed on May 8, 1973. Under these circumstances, there would have ordinarily been no reason why this matter could not have been heard and disposed of by the December, 1973 Term of this court if petitioner or his attorney had expeditiously prosecuted the appeal. Therefore, in the absence of any unusual or extenuating factors, the period during which petitioner's back pay, if any, was to be measured, would have run only until the last day of the December, 1973 Term of this court.

Where the obligation for reimbursing an improperly dismssed employee for back pay is borne by the taxpayers and

not by the individuals responsible for the action, this court should not sanction or encourage any delay in the hearing or disposition of the proceedings by directing reimbursement of back pay during the period involved in the delay (see *Matter of Haynes v Board of Educ.,* 57 AD2d 959, 960 [concurring mem]; see, also, *Gerber v New York City Housing Auth.,* 42 NY2d 162; *Matter of Amkraut v Hults,* 21 AD2d 260, affd 15 NY2d 627).

However, the record indicates that by notice of motion dated June 4, 1976 petitioner moved for summary reversal of the determination of the Special Term and for a hearing *de novo* on the ground that a significant portion of the record on appeal had been lost and that he was thus unable to perfect his appeal. In his moving affidavit petitioner described his fruitless search of over two years' duration to find the necessary papers in order to properly perfect the appeal. The respondent cross-moved to dismiss the appeal for gross laches. On July 1, 1976, this court denied respondent's cross motion to dismiss. It also denied petitioner's motion for summary reversal, with leave to renew on the argument of or submission of the appeal.

In a subsequent successful motion by petitioner for permission to file one typed copy of the transcript of the disciplinary hearing and to file less than the required number of briefs, petitioner alleged that his wrongful dismissal had left him in a financially precarious situation and that he was unable to bear the cost of reproducing the 800-page transcript. In addition, he alleged that the Nassau County Attorney had refused to consider his request to perfect the appeal under an agreed statement of facts pursuant to CPLR 5527.

Under these circumstances, the proceeding should be remanded to the Special Term for a hearing to determine an outside time limit within which petitioner could have reasonably been expected to perfect his appeal and to determine the compensation, in the form of back pay, to which petitioner was entitled during that period.

MARGETT, J. (dissenting). I would affirm the judgment of Special Term in all respects. While I adopt nearly all of the majority's version of the facts, I must disagree with its characterization of the content of the March 9, 1972 memorandum. That memorandum, which forms the basis of two of the specifications against petitioner, did not limit itself to referrals for *elective* abortions. Nor did it, by its terms, confine

itself to referrals for Medicaid patients. The language employed by petitioner was as follows:

"Today's paper carries a story that the official spokesman for the Nassau County Medical Center has stated that the Family Planning Clinic which is to open at Meadowbrook on Monday will include abortion referrals among its services and in fact such referrals are already being made by representatives of the County Social Services Department stationed at this hospital.

"Since this is contrary to stated policy as was the use of Medicaid funds for such abortions, I hereby direct that the salaries of any and all Social personnel stationed at the hospital involved in such referrals be deleted from our State and Federal claim for reimbursement."

Petitioner had no authority to issue such an all-encompassing directive. Indeed *Matter of City of New York v Wyman* (30 NY2d 537), which supposedly supplied petitioner with authority for this directive, dealt only with Medicaid reimbursement for *abortions*—it did not intimate that the *salaries* of personnel making abortion referrals could not be reimbursable. It would appear that the orderly functioning of county government would best be served by appropriate intradepartmental disciplinary action against Social Services personnel who were making improper referrals—petitioner overstepped his bounds by attempting to control, from the accounting section, what is essentially a personnel problem.

The March 9 memorandum was disruptive in another sense. A fair reading of the memorandum indicates that petitioner was using this "departmental memo" as a forum for his personal beliefs. Special Term aptly observed that "the repeated charged references to 'create life' and 'destroy life', not contained anywhere in Social Services statutes or regulations, and petitioner's concluding statement that 'someone in the County is intent on using my tax dollars in one way or another to take the life of an unborn child' reflect indeed the intrusion of personal bias into official duty."

The majority's conclusion, that the commissioner's countermand should make a difference, is inconsistent with its affirmance with respect to petitioner's refusal to sign and certify the claim for reimbursement for March, 1972 expenditures. The commissioner certified that claim himself and no loss to the county resulted.

Finally, this court's affirmance of those specifications arising

out of petitioner's blatant refusal to do his duty is, in my view, sufficient to justify the penalty of dismissal imposed (see *Matter of Ebner v Board of Educ.,* 42 NY2d 938; *Matter of Pell v Board of Educ.,* 34 NY2d 222).

MARTUSCELLO, J. P., SUOZZI and O'CONNOR, JJ., concur in the *Per Curiam* opinion; MARGETT, J., dissents and votes to affirm the judgment, with an opinion.

Judgment of the Supreme Court, Nassau County, entered April 5, 1973, modified, on the law, by (1) deleting the first decretal paragraph thereof, (2) deleting from the second decretal paragraph thereof the provision dismissing the petition in all respects and substituting therefor provisions (a) granting the petition to the extent of dismissing Specification 3 of Charge 1 and Specification 2 of Charge 2 and (b) reducing the penalty imposed upon the remaining charges to a suspension for a period of one year. As so modified, judgment affirmed, without costs or disbursements, and proceeding remanded to Special Term for a hearing to (1) determine the outside time limit within which petitioner could reasonably have been expected to perfect his appeal and (2) fix the amount of back pay due him, in accordance with the *Per Curiam* opinion herein.